W. C. Hudlow, Jr., and Jo Ann Hudlow, et al. [1] v. Commissioner. Hudlow v. Commissioner
Docket Nos. 660-69, 661-69, 662-69, 663-69, 664-69, 6042-69.
United States Tax Court
T.C. Memo 1971-218; 1971 Tax Ct. Memo LEXIS 114; 30 T.C.M. (CCH) 894; T.C.M. (RIA) 71218; August 30, 1971, Filed Ford P. Mitchell, 9th Floor Maclellan Bldg., 37042, Chattanooga, Tenn., and William L. Taylor, Jr., for the petitioners. Vallie C. Brooks, for the respondent. SIMPSON
Memorandum Findings of Fact and Opinion SIMPSON, Judge: In docket No. 660-69, the respondent determined the following deficiencies in the Federal income tax of the petitioners, W. C. Hudlow, Jr., and Jo Ann Hudlow: Year
Deficiency
1963
$22,909.71
1964
72,034.22
1965
27,996.42 In addition, the respondent determined an overassessment in such petitioners' Federal income tax for 1966 in the *119 amount of $2,851.47. In docket No. 661-69, the respondent determined the following deficiencies in the Federal income tax of the petitioner, Chattanooga Warehouse and Cold Storage Company: Year
Deficiency
1964
$11,413.61
1965
22,484.00
1966
2,941.40
In docket No. 662-69, the respondent determined the following deficiencies in the Federal income tax of the petitioner, Arrow Transfer and Storage Company: Year
Deficiency
1964
$ 42.55
1965
5,121.42
1966
386.50
In docket No. 663-69, the respondent determined the following deficiencies in the Federal income tax of the petitioner, Southern Land and Development Company: Year
Deficiency
1964
$2,407.29
1965
2,277.27
1966
2,461.77
In docket No. 664-69, the respondent determined the following deficiencies in the Federal income tax of the petitioner, Merchants and Manufacturers Transfer Co.: Year
Deficiency
1964
$2,801.10
1965
5,940.82
1966
7,680.00
In docket No. 6042-69, the respondent determined a deficiency in the Federal income tax of the same petitioner in the amount of $332.74 for the year 1967. In docket No. 660-69, the issues *120 for decision are (1) whether advances made by the petitioner, W. C. Hudlow, Jr., to Jefferson Warehouse and Cold Storage Company in 1964 and 1965 are deductible as either business expenses or ordinary losses; (2) whether Mr. Hudlow realized income from Arrow Transfer and Storage Company in 1965; (3) whether hospitalization insurance premiums paid by Arrow for Mr. Hudlow's father and brother, and Arrow's write-off of amounts 895 due from Mr. Hudlow's brother for moving expenses, constitute dividend income to Mr. Hudlow; (4) whether Mr. Hudlow realized dividend income from Chattanooga Warehouse and Cold Storage Company in 1963, 1964, and 1965 by virtue of certain disbursements of that corporation which were (a) charged to accounts receivable, (b) allegedly made for Mr. Hudlow but charged to the account of Jefferson Warehouse and Cold Storage Company, (c) made for Mr. Hudlow but not posted to his account until the year following the disbursement, and (d) allegedly made for Mr. Hudlow but charged to the account of Tennessee River Transportation Company; and (5) whether Mr. Hudlow is taxable on rental income received under a lease between him and Southern Land and Development Company *121 in 1964 and 1965. The petitioners have conceded that an item of $1,030.07, representing moving services performed by Arrow for the Hudlows' personal benefit, should be treated as a constructive dividend to Mr. Hudlow. In docket No. 661-69, the issues for decision are (1) whether the petitioner Chattanooga Warehouse and Cold Storage Company properly charged off as a bad debt in 1965 certain sums of money due from Jefferson Warehouse and Cold Storage Company; (2) whether bonuses declared by Chattanooga for the taxable years ended September 30, 1964, and September 30, 1965, represent unreasonable compensation to the extent of $22,600 in each such year; (3) whether Chattanooga is entitled to claim depreciation on equipment received from Tennessee River Transportation Company and credited to that corporation's account receivable with Chattanooga; (4) whether Chattanooga's expenditures with respect to pouring a concrete floor and overhauling certain forklift trucks are deductible repair expenses or capital expenditures; (5) whether amounts paid by Chattanooga to another corporation for an account owed by Jefferson constituted an ordinary and necessary business expense of Chattanooga; (6) *122 whether Chattanooga was entitled to a deduction for certain legal and auditing fees in the taxable year ended September 30, 1966; and (7) whether Chattanooga was entitled to charge off an account of Mr. Hudlow's father as a business expense. The petitioners have conceded that Chattanooga was not entitled to charge off an account of Mr. Hudlow's brother. In docket No. 662-69, the issues for decision are (1) whether the petitioner Arrow Transfer and Storage Company can deduct as ordinary and necessary business expenses certain insurance premiums which it paid for Mr. Hudlow's father and brother; (2) whether Arrow's deduction for compensation paid to Mr. Hudlow is unreasonable; (3) whether Arrow was entitled to charge off as a bad debt in 1965 amounts which it spent for Mr. Hudlow's brother's moving expenses and hospitalization insurance premiums; and (4) whether Arrow was entitled to deduct fees which it accrued for an audit of its books for 1966. On another issue, the petitioners have conceded that amounts spent by Arrow representing services rendered to Mr. Hudlow should be treated as constructive dividends to him, and not as ordinary and necessary business expenses of Arrow. (The *123 concession with respect to Mr. Hudlow's income was mentioned earlier.) In docket No. 663-69, the issues for decision are (1) whether the petitioner Southern Land and Development Company properly amortized the cost of a certain building; and (2) what is the correct useful life of another building owned by Southern. On another issue, the petitioners have conceded that Southern was not entitled to deduct certain mortgage loan costs. In docket Nos. 664-69 and 6042-69, the issues for decision are whether the petitioner Merchants and Manufacturers Transfer Co., Inc., is entitled to deductions in 1964, 1965, 1966, and 1967, as ordinary and necessary business expenses, for commissions paid to Mr. Hudlow and one James Whitaker. Findings of Fact In General Some of the facts have been stipulated, and those facts are so found. The petitioners W. C. Hudlow, Jr., and Jo Ann Hudlow, husband and wife, resided in Lookout Mountain, Tennessee, when their petition was filed in this case. They filed their joint Federal income tax returns for the years 1963 through 1966, using the cash method of accounting, with either the district director of internal revenue, Nashville, Tennessee, or the *124 director of the Southeast Service Center, Chamblee, Georgia. Mr. Hudlow will sometimes be referred to as the petitioner. The petitioner Chattanooga Warehouse and Cold Storage Company (Chattanooga) is a Tennessee corporation which had its principal place of business in Chattanooga, Tennessee, when its petition was filed in 896 this case. It filed its Federal income tax returns for each of its taxable years ended September 30, 1961 through 1968, using the accrual method of accounting, with either the district director of internal revenue, Nashville, Tennessee, or the director of the Southeast Service Center, Chamblee, Georgia. The petitioner Arrow Transfer and Storage Company (Arrow) is a Tennessee corporation which had its principal place of business in Chattanooga, Tennessee, when its petition was filed in this case. It filed its Federal income tax returns for the calendar years 1963 through 1968, using the accrual method of accounting, with either the district director of internal revenue, Nashville, Tennessee, or the director of the Southeast Service Center, Chamblee, Georgia. The petitioner Southern Land and Development Company (Southern) is a Tennessee corporation which *125 had its principal place of business in Chattanooga, Tennessee, when its petition was filed in this case. It filed its Federal income tax returns for the calendar years 1961 through 1968, using the accrual method of accounting, with either the district director of internal revenue, Nashville, Tennessee, or the director of the Southeast Service Center, Chamblee, Georgia. The petitioner Merchants and Manufacturers Transfer Co., Inc. (M & M) is a Tennessee corporation which had its principal place of business in Chattanooga, Tennessee, when its petitions were filed in these cases. It filed its Federal income tax returns for each of its taxable years ended on March 31, 1964 through 1968, using the accrual method of accounting, with either the district director of internal revenue, Nashville, Tennessee, or the director of the Southeast Service Center, Chamblee, Georgia. Mr. Hudlow has owned all of the outstanding stock of Chattanooga since it was incorporated in 1953. Arrow was incorporated in 1949, and since 1959, Mr. Hudlow has owned 99.5 percent of that corporation's outstanding stock, with the remainder owned by his brother, James W. Hudlow (James). M & M has had 20 shares of stock *126 outstanding since its incorporation in 1957. Nineteen shares of such stock were originally issued to James W. Whitaker (Mr. Whitaker), with the remaining share issued to his wife. Upon receipt of the 19 shares issued in his name, Mr. Whitaker endorsed and delivered certificates representing 15 of such shares to Mr. Hudlow, but such transfer was not recorded in the stock book of M & M, as Mr. Hudlow wished to keep his ownership interest in M & M concealed. During the years 1963 through 1967, Mr. Hudlow actually owned 75 percent of the outstanding stock of M & M, and Mr. Whitaker actually owned the remaining 25 percent. Tennessee River Transportation Company (Tennessee) is a Tennessee corporation, all the outstanding shares of which have been owned by Mr. Hudlow since at least October 1962. Jefferson Warehouse and Cold Storage Company (Jefferson) was a Delaware corporation, all the outstanding shares of which were issued to Mr. Hudlow in 1958 in exchange for $1,000. Jefferson's principal place of business from 1958 to 1965 was in Birmingham, Alabama. Jefferson went out of business prior to June 30, 1965. Its final income tax return bore the notation, "Assets taken over by creditors; *127 operations ceased February 1965." During all of the years in issue, Mr. Hudlow was the president of, and a director of, Chattanooga, Arrow, Jefferson, Tennessee, and Southern. He was neither an officer nor a director of M & M during the years in issue. During such years, no cash dividend was ever formally declared or paid by Chattanooga, Arrow, Jefferson, Tennessee, or M & M. The respondent's agent first contacted Mr. Hudlow, and commenced his examination of the petitioners in this case, on August 4, 1966. Because of the number of issues in this case, we shall consider them one by one with respect to our Findings of Fact and Opinion. The regrettable length of this opinion has been made necessary by the multitude of issues that the parties have presented to the Court for decision. W. C. Hudlow, Jr., and Jo Ann Hudlow Docket No. 660-69 Issue 1 Findings of Fact In 1958, Mr. Hudlow purchased all the stock of two unsuccessful corporations which were occupying, as lessees, premises at the Birmingham Food Terminal in Birmingham, Alabama. In July 1958, he organized Jefferson to carry on the business of those two corporations at the Birmingham Food Terminal. The Birmingham *128 Food Terminal had been constructed by Southern Railway Company, which approved of Mr. Hudlow's 897buy-out of the two unsuccessful corporations conducting business at that terminal. Prior to Mr. Hudlow's purchase of the two unsuccessful corporations in Birmingham, those corporations had become involved in a controversy in which the Interstate Commerce Commission (ICC) alleged that Southern Railway Company had violated the Elkins Act by granting rebates, in the form of reduced rentals, to the businesses occupying space at the Birmingham Food Terminal. Court proceedings with respect to such controversy had begun in 1955 or 1956, prior to Mr. Hudlow's acquisition of the corporations. In 1961, both Mr. Hudlow and Jefferson were added as parties defendant in litigation pending before the United States District Court for the Northern District of Alabama, involving the United States, Birmingham Food Terminal, Southern Railway Company, and others. Such litigation concerned primarily the questions of what rentals must be charged and collected by Southern Railway Company from tenants at the Birmingham Food Terminal, and what was the minimum price for which any of such premises could be *129 sold. The district court found that Southern Railway Company had made unlawful and discriminatory rebates to the tenants of the Birminghan Food Terminal in the form of reduced rentals. It concluded that Southern Railway Company had been charging and collecting an insufficient amount of rent from Jefferson, which had become its tenant on August 1, 1958. The district court decided that Mr. Hudlow in his individual capacity was properly made a defendant to the litigation, as well as Jefferson, because he personally conducted the negotiations whereby Southern Railway Company granted certain concessions to Jefferson, and because Jefferson, Mr. Hudlow's wholly owned corporation, was "created as a part of the concession device * * *." These circumstances, the district court felt, required "nonrecognition of the legal fiction of a separate corporate entity." The district court found that "to have avoided unjust discrimination, favoritism, and invidious rebates," Southern Railway Company should have charged and collected, and Jefferson and Mr. Hudlow should have paid, rents aggregating $431,251.57 for the period in issue, rather than the amount of $401,493.56 that Jefferson and Mr. Hudlow *130 reportedly paid for such period. Therefore, the court decided, judgment should be entered in favor of Southern Railway Company and against Jefferson and Mr. Hudlow in the amount of $29,758.41 by reason of the back rentals found to be due. At nearly the same time as the district court's decision was entered, the Internal Revenue Service in Birmingham advised Mr. Hudlow that Jefferson had not been paying its withholding taxes. Jefferson lacked the funds to make such tax payments, and the Internal Revenue Service advised Mr. Hudlow that he would be personally held liable if the money owed by Jefferson was not paid. The total of the rental obligations and the withholding tax arrearages came to $50,000. For the purpose of enabling Jefferson to meet such obligations, Mr. Hudlow transferred $50,000 to the coporation in 1964. Jefferson recorded such transfer as "loans from stockholders" on its books and records. When Mr. Hudlow made such transfer to Jefferson, he hoped to eventually recover the money when Jefferson's operations were sold, as was contemplated. Mr. Hudlow obtained the $50,000 by borrowing it from Albert Lea Freezer Warehouse Company (Albert Lea), a corporation controlled *131 by a personal friend of his. Later in 1964, Mr. Hudlow repaid the amounts borrowed from Albert Lea by means of funds withdrawn from Chattanooga, as will be discussed later. In return for his transfer to Jefferson, Mr. Hudlow received a note for $50,000 executed by his brother James for Jefferson. James signed the note in his capacity as "Vice-President & Genl. Mgr." of that corporation. The note recited that the principal was payable on demand, and the interest rate shown was 6 percent. The note was not secured in any manner; Jefferson had no security to offer. For the repayment of the note, Mr. Hudlow could look only to the anticipated sale of Jefferson's accounts and assets; but when final disposition was made of such accounts and assets, the proceeds were too slim to satisfy Jefferson's debts. Subsequently, another judgment was entered against Mr. Hudlow individually arising out of the same litigation in the district court with respect to the rentals owed by him and Jefferson to Southern Railway Company for the occupancy of certain buildings at Birmingham Food Terminal. This judgment required Mr. Hudlow to pay $6,793.50 for Jefferson's occupancy of such buildings. At the time *132 that judgment was 898 entered, the district court judge was aware that Jefferson was defunct. On December 6, 1965, Mr. Hudlow paid $6,936.49 to Southern Railway Company, in satisfaction of the judgment in the amount of $6,793.50 plus interest of $142.99. On their joint income tax return for 1964, Mr. and Mrs. Hudlow deducted $50,000, stating that they had loaned this amount to Jefferson, and such loan had become worthless during the year. They claimed that Jefferson was "ruled by a Federal District Court in Alabama to be of a nature which required nonrecognition of the separate corporate entity; and personal liability for corporate indebtedness was imposed upon taxpayer by that court." Such claim was in addition to a claim on that return for a short-term capital loss in the amount of $1,000 for the 50 shares of Jefferson stock (which were all of the outstanding shares) issued in the petitioner's name. On their 1965 return, the Hudlows deducted $6,936.49 as a "payment made for" Jefferson, the amount of which "became worthless during the year * * *." A similar explanation was given about the district court's alleged imposition upon Mr. Hudlow of personal liability for Jefferson's *133 indebtedness. The respondent disallowed both deductions in full; he determined that Mr. Hudlow's payments were contributions to the capital of Jefferson. Opinion The issue for decision is whether Mr. Hudlow can deduct the amounts of $50,000.00 in 1964 and $6,793.50 in 1965, as either ordinary and necessary business expenses under section 162 of the Internal Revenue Code of 1954, [2] or losses incurred in a transaction entered into for profit under section 165(c)(2). Mr. Hudlow has abandoned the position that such amounts constituted debts which became worthless in the years of deduction. For 1965, the respondent allowed the deduction of $142.99 of Mr. Hudlow's payment as interest. The petitioner's first argument is that the sums he expended should be treated as his ordinary and necessary business expenses. He advances only one rationale as the basis for such treatment: that we should ignore Jefferson's separate corporate entity for tax purposes. In support of such argument, the petitioner points to the statement of the United States District Court for the Northern District of Alabama *134 in its "memorandum opinion and decree" to the effect that the situation before it warranted "nonrecognition of the legal fiction of a separate corporate entity," and to the respondent's alleged assertion that he, Mr. Hudlow, would be held personally liable as the president of Jefferson for the withholding taxes that such corporation owed but did not pay. Unfortunately for the petitioner's argument, the recognition for tax purposes of a corporation as an entity separate from its sole shareholder is a principle which harks back to the dawn of American tax law. John K. Greenwood 1 B.T.A. 291, 294 (1925). The separate entity of a corporation is respected for tax purposes, other than "in exceptional situations where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." New Colonial Ice Co. v. Helvering 292 U.S. 435, 442 (1934); Ernest H. Weigman 47 T.C. 596, 604 (1967), affd. per curiam 400 F. 2d 584 (C.A. 9, 1968). When a corporation carries on business activities, the fact that the owner *135 directs all of its affairs, provides all of its assets, and takes all of its profits makes no difference for tax purposes. National Carbide Corp. v. Commissioner, 336 U.S. 422 (1949); Perry R. Bass 50 T.C. 595, 601 (1968); Ernest H. Weigman, supra at 605. A corporation may not be disregarded for tax purposes "if, inter alia, a bona fide intention in creating it was that the corporation itself should have some real substantial business function, or if it actually engages in business; on the other hand, the corporation may be disregarded, in the absence of such an intention or activity." Jackson v. Commissioner, 233 F. 2d 289, 290 (C.A. 2, 1956), affg. 24 T.C. 1 (1955). It seems clear, from the record, that Jefferson had a bona fide business purpose, and that it actually engaged in business activities of a substantial nature; therefore, it is a separate taxable entity, Moline Properties v. Commissioner, 319 U.S. 436 (1943). U.S. 436 (1943). The petitioner cites Jackson v. Commissioner, supra, as authority for his position, because in that case, the corporations were 899 disregarded *136 for tax purposes. However, in such case, the Court of Appeals held that the corporations in issue were formed solely to transfer and hold stock of other corporations, and that they engaged in no substantial business activity; thus, this case is clearly distinguishable on its facts. Business expenses, in order to be deducted pursuant to section 162, must be expenses of the taxpayer who claims the deduction, and not expenses of another taxpayer. Walton O. Hewett, 47 T.C. 483, 488 (1967); Jacob M. Kaplan, 21 T.C. 134, 146 (1953). Furthermore, as the statutory language expresses, the expenses must be "ordinary and necessary" to the taxpayer claiming the deduction. That it was necessary to make the payments does not suffice; "[many] necessary payments are charges upon capital." Welch v. Helvering 290 U.S. 111, 113 (1933). Furthermore, "[the] fact that an obligation to pay has arisen is not sufficient. It is the kind of transaction out of which the obligation arose and its normalcy in the particular business which are crucial and controlling." Deputy v. DuPont, 308 U.S. 488, 496 (1940). *137 In this case, the disputed expenditures were attributable to a business conducted by Jefferson for its benefit. Jefferson was in a trade or business which required the rental of premises at the Birmingham Food Terminal; Mr. Hudlow's trade or business, with respect to Jefferson, was merely of a corporate officer. Under these circumstances, we are not convinced that a corporation's rental obligations and withholding tax payments are the ordinary and necessary business expenses of its chief officer. The district court said that nonrecognition of the corporate entity was required by the finding that certain concessions granted by the Southern Railway Company to Jefferson were solicited by Mr. Hudlow personally, "and were availed of by his wholly owned corporation, created as a part of the concession device." However, such court did not make clear whether the nonrecognition of the corporate entity was to be for all purposes, or solely for the purpose of requiring Mr. Hudlow to redress the violations of the Elkins Act, which he had apparently caused his wholly owned corporation to commit. Jefferson, which was no "dummy" corporation, had been treated as a separate corporate entity for Federal *138 tax purposes continuously since the beginning of its business operations in 1958, and presumably it and Mr. Hudlow realized benefits as a result of such treatment. Thus, whatever the motives of the district court in refusing to recognize that corporation's separate existence for the purpose of the additional rentals found to be due, the petitioner has shown us no reason to disregard its existence for Federal tax purposes. Moreover, the meagerness of Mr. Hudlow's investment in such corporation - all of the outstanding shares were issued to him for $1,000 - may have contributed significantly to Jefferson's inability to discharge its obligations. This factor may have been considered by the district court in holding Mr. Hudlow personally liable for the rental charges, and such factor would be consistent with the respondent's treatment of Mr. Hudlow's expenditures as contributions to capital. With respect to Jefferson's liability for withholding taxes, we note that even if the corporation had paid over such taxes to the respondent in the ordinary course of business, it would not have been entitled to a deduction by reason of such transmittal. See sec. 1.164-2(a), Income Tax Regs. *139 The withholding taxes represent a liability which was originally that of Jefferson's employees; Jefferson was acting as a collection and transfer agent with respect to the amounts thereof. Presumably, because the withholding taxes are deducted from the employees' gross pay, the corporate employer already received a tax deduction with respect to such amounts in the form of a deduction for salaries and wages paid. Mr. Hudlow testified that if he had not paid the withholding taxes that Jefferson owed but failed to pay, the respondent was going to "sue me personally." Such testimony was not explained; perhaps, the statement meant that the respondent would have taken action pursuant to section 6672, which prescribes a penalty for "[any] person required to collect, truthfully account for, and pay over any tax * * * who willfully fails to collect such tax, or truthfully account for and pay over such tax * * *." If Mr. Hudlow, as Jefferson's president, was the officer responsible for collecting and turning over the amounts that Jefferson presumably withheld for Federal taxes, and failed to discharge such responsibility in a proper and timely manner, we are not convinced that he incurred *140 an ordinary and necessary business expense within the purview of section 162 when he finally did discharge the responsibility under the pressure of a threatened penalty. 900 Next, we turn to the petitioner's alternative argument with respect to the same two expenditures: that they are deductible under section 165(c) (2) as losses which he suffered in a transaction entered into for profit. The business which an officer conducts for a corporation is not his own business; a corporation and its stockholders are separate entities. Dalton v. Bowers 287 U.S. 404 (1932); Ralph E. Wilson, 40 T.C. 543, 550 (1963). See also Ernest H. Weigman, supra, and authorities cited therein. Therefore, the fundamental weakness in the petitioner's argument with respect to section 165(c) (2) is that he was not engaged in a transaction entered into for profit when he advanced the disputed funds to Jefferson or paid off the obligations which had been incurred by Jefferson in the course of its business operations. Certainly, Jefferson was engaged in a business which *141 it had entered into for profit at the time it rented the buildings and incurred the obligations; but, as we have rejected the argument that the corporate entity should be disregarded for tax purposes, we must conclude that Mr. Hudlow has not shown that he in his individual capacity was engaged in such a transaction as to entitle him to a deduction under section 165(c) (2). Had profits been reaped from Jefferson's business operations, they would have been earned by, and would have belonged to, the corporation and not Mr. Hudlow. Moreover, at the time Mr. Hudlow did get involved in his individual capacity, when he was held liable for the additional rental obligations and when he advanced the back tax money, there was no longer any reasonable expectation of making a profit. The most that the petitioner allegedly hoped for at the time of making the payments was that his expenditures would be repaid out of the liquidation of Jefferson's business, and even this modest expectation is highly dubious in light of the circumstances as they then existed. In support of his position, the only case cited by the petitioner is Commissioner v. Condit, 333 F. 2d 585 (C.A. 10, 1964), affg. *142 40 T.C. 24 (1963). In that case, the taxpayer and another man embarked on a business venture in which they agreed from the inception that they would share the profits and losses equally between themselves. They formed two corporations, one to hold title to the land on which the business was being operated, and the other to operate the business. The latter corporation borrowed money, with the taxpayer and his co-venturer assuming personal liability on the notes. The business operation was unsuccessful, and produced substantial losses. The taxpayer made certain payments to his co-venturer pursuant to their agreement to share equally the profits and losses. The Tenth Circuit held that he could deduct his losses as represented by those payments, as losses arising out of a transaction entered into for profit. The Tenth Circuit stressed the agreement which had been entered into by the taxpayer and his co-venturer prior to forming the corporations. Such agreement survived the formation of the corporations, and the disputed payments were made pursuant thereto. In making the payments, the taxpayer was only living up to an obligation to which he had committed himself at the inception *143 of the business, when it was of course hoped that the business would produce profits. In the case at hand, there is no hint that the petitioner expected to share Jefferson's profits and losses in any manner other than that usual to a shareholder. Therefore, we believe that Commissioner v. Condit, supra, is factually distinguishable. In one case, this Court held that a corporate officer and director could deduct, under the predecessor of section 165(c) (2), certain taxes including Federal withholding taxes which he paid for the corporation. Peter Stamos, 22 T.C. 885 (1954). However, in Benjamin T. Smith, 34 T.C. 1100, 1107 (1960), affd. per curiam 294 F. 2d 957 (C.A. 5, 1961), we pointed out that the Court's holding in Stamos was based solely upon its conclusion that the payments by the taxpayer were not voluntary; apparently, the question of the voluntary nature of the payments was the only point seriously argued by the parties with regard to that issue, and they considered that the answer to such question would be dispositive of the outcome. In Smith, the taxpayer was an officer, director, and shareholder of a corporation *144 which failed to pay over withheld taxes to the Government; as a result, a 100-percent penalty was assessed against the taxpayer pursuant to the predecessor of section 6672. This Court held that such taxpayer could not deduct the amount of his payment either as a loss under section 165(c) or as a bad debt under section 166, because to allow a deduction for 901 the payment of the penalty would frustrate public policy. It seems clear that to allow a deduction for a payment made as a result of a threat of such a penalty would equally frustrate public policy. To distinguish Benjamin T. Smith because of the lack of an assessment of a penalty under section 6672 in this case, and to hold for Mr. Hudlow on the issue of the payment of the withholding taxes, would produce anomalous and undesirable results. If a responsible corporate officer causes the corporation to pay over the withholding taxes to the Government in a proper and timely manner as required by law, neither the officer nor the corporation gets a deduction as a result; but, if we held for Mr. Hudlow, then the officer who neglects his duty, permits the corporation to divert the withheld money and use it for other purposes, and *145 later pays the taxes out of his own pocket when the corporation is insolvent (or nearly so) and the Government is threatening him personally with punitive measures, but prior to the time when a penalty is actually assessed against him, he would become entitled to a tax deduction for the full amount of the paid-over taxes. Such a result would literally reward the controlling officer of a corporation whose fortunes are plummeting for failing to discharge the duties which are imposed upon him by law. A taxpayer seeking a deduction must be able to point to a statutory provision which allows such a deduction, and he must show that he comes within the terms of that statute. Milton Hart, 41 T.C. 131, 142 (1963), affd. per curiam 338 F. 2d 410 (C.A. 2, 1964). In our judgment, the petitioner has not shown that the expenditures here in dispute constituted either ordinary and necessary expenses of his trade or business as a corporate officer, or losses incurred in a transaction which he entered for the purpose of making a profit. Therefore, we uphold the determination of *146 the respondent disallowing the deductions in full. Issue 2 Findings of Fact On its 1965 income tax return, Arrow deducted $22,648.99 as compensation paid to Mr. Hudlow, its president. Such compensation consisted of Mr. Hudlow's regular salary of $9,600.00 ($800.00 per month), two bonuses dated December 31, 1965, in the amounts of $1,200.00 and $10,800.00, and an item of "additional salary" carrying the same date in the amount of $1,048.99. In Arrow's books, the amounts of $1,200.00 and $10,800.00 described as bonuses were debited to salaries and were credited against Mr. Hudlow's "accounts receivable" with Arrow. Such account of Mr. Hudlow with Arrow was reduced to a balance of $4.22 at the end of 1965 after the two "bonuses" were credited to that account. The item pertaining to the "additional salary" was shown in Arrow's books as a debit of $1,048.99 to salaries and a credit in the same amount to "Accounts Receivable - J. H. Hardy & Assoc." That journal entry was accompanied by this description: "To write off balance due from J. H. Hardy and Associates to account W. C. Hudlow, Jr. and record as part of his salary 1965." Mr. Hudlow reported all three amounts, the two "bonus" *147 items and the one "additional salary" item, in his and his wife's joint return for 1966, rather than for 1965. Neither the $10,800.00 item nor the $1,048.99 item was formally declared as a bonus by Arrow. J. H. Hardy & Associates was a firm which handled all of Mr. Hudlow's accounting and tax work from 1949 to 1965 when Mr. Hardy died. The books of the Hardy firm carried an amount of $1,048.99 as a fee owed to such firm by Mr. Hudlow personally; such fee was for advice given to Mr. Hudlow with respect to a business transaction. Then, after Mr. Hardy's death, when the firm was being continued by a former assistant to Mr. Hardy, such firm moved its business offices to another location; Arrow performed services with respect to such move. The Hardy firm's business was subsequently sold to the accounting firm of Haskins and Sells. Haskins and Sells then handled Mr. Hudlow's and Arrow's accounting work for a time thereafter, and in the course of doing such work, the accounting firm offset on Arrow's books the services rendered by Arrow to the Hardy firm against the amount which Mr. Hudlow owed to the Hardy firm, and treated the amount of such offset as income to Mr. Hudlow personally. *148 On November 3, 1958, Mr. Hudlow transferred certain equipment to Arrow. Such equipment included trailers, 2-wheel "trucks," an adding machine, a typewriter and table, and an automobile. The total book value of such assets when transferred was $10,800. Arrow lacked the funds to pay Mr. Hudlow for the assets transferred. Arrow gave him no security for the alleged debt; Mr. Hudlow "told them they could pay me whenever 902 they wanted to." Mr. Hudlow took no money out of Arrow in payment for such assets until 1965, when he needed funds to expand his house, and he withdrew $10,800 from Arrow, "on the assumption they owed me that money." He reported such amount as income because his accountants, Haskins and Sells, treated it as a bonus; he reported it for 1966 because it was not until that year that he realized that the accountants had treated it as a deduction on Arrow's 1965 return. Arrow filed its Federal income tax return for 1958 on Form 1120-S. Such form stated that Arrow had, on November 26, 1958, elected to be treated as a small business corporation. The return reported that Arrow suffered a net operating loss during 1958 in the amount of $20,506.26. It indicated that Mr. *149 Hudlow was the sole shareholder, and that he was entitled to the entire distribution of the net operating loss. Furthermore, it revealed that Arrow had suffered a deficit in 1957 of $15,901.67, and in 1956 of $14,096.25. Mr. and Mrs. Hudlow's personal joint income tax return for 1958 was destroyed, and no copies were available; Mr. Hudlow could not recall at trial whether he claimed a deduction on such return for the net operating loss reported by Arrow on its return for 1958. Mr. Hudlow's "regular salary" from Arrow was the same in 1964 and 1966 as it was in 1965: $9,600 per year. However, in 1964 and 1966, unlike 1965, such amount was all that Arrow deducted on its income tax return as compensation to Mr. Hudlow. Arrow claimed deductions for compensation to Allen Hodge, its vice president and general manager, as follows: in 1964, $6,733.31 as basic salary and $227.57 as a bonus; in 1965, $7,994.13 as basic salary and $960.88 as a bonus; and, in 1966, $8,062.39 as basic salary and $2,055.00 as a bonus. The petitioner concedes on brief that the "bonus" of $1,200 should have been included in his income for 1965. However, he denies that either the $10,800 "bonus" or the $1,048.99 *150 "additional salary" should be included in his income for either 1965 or 1966. The respondent has determined that the petitioner's 1966 income should be decreased by $13,048.99, to correspond to the adjustment made in the petitioner's 1965 income. Opinion The issue for decision is whether the amounts of $1,048.99 and $10,800.00 constituted income to Mr. Hudlow in 1965. The petitioner contends that such amounts had been treated as compensation by Arrow on its 1965 return, and by himself on his 1966 return, as a result of an accountant's error. The petitioner's contention with respect to the $1,048.99 is based on his assertion that he had some argument with the Hardy firm about the correctness of the amount that such firm charged him, and that he had not planned to pay the charge until he had negotiated a reduction in amount. However, the record indicates that when Mr. Hudlow learned of the treatment that his accountants had accorded to such charge, he offered no serious objection. It is clear that some valid debt, unrelated to Arrow, existed from Mr. Hudlow to the Hardy firm, and it is equally clear that Arrow surrendered an asset that belonged to it - its right to collect its *151 charge for performing moving services for the Hardy firm - for the payment of Mr. Hudlow's personal debt. To the extent that Arrow used its assets to discharge a personal debt of Mr. Hudlow, there can be no question but that he received income as a result. W. B. Rushing, 52 T.C. 888, 893 (1969), affd. 441 F. 2d 593 (C.A. 5, 1971). Furthermore, the value of Arrow's asset that was surrendered for such purpose was apparently $1,048.99, and there is absolutely no evidence to demonstrate that the proper amount of Mr. Hudlow's debt was in fact something other than $1,048.99. That Mr. Hudlow hoped to or would have liked to negotiate the figure downward seems irrelevant, because in fact he did not do so. Therefore, we sustain the respondent's determination that the $1,048.99 should be included in Mr. Hudlow's income for 1965. A closer question exists with respect to the $10,800, which the petitioner claims to have received in payment for assets transferred to Arrow in 1958. It is unchallenged that Mr. Hudlow transferred equipment worth that amount to Arrow in 1958. No documentary evidence was presented to show how Arrow and Mr. Hudlow regarded the transaction *152 at the time; we have only his testimony that he regarded it as a sale transaction in which Arrow could pay him "whenever they wanted to." At the time of the transfer, the corporation lacked the wherewithall to pay for the equipment; it gave no security for the alleged purchase 903 price. There is no explanation as to why the equipment itself was not used as security. In 1958, Mr. Hudlow was the sole shareholder of Arrow; it reported a net operating loss for that year in excess off $20,000, and had had substantial deficits in each of the 2 preceding years. The success of Mr. Hudlow's argument that his withdrawal in 1965 was simply a repayment depends upon his establishing that an indebtedness to him arose in 1958 as a result of the transfer of assets. Whether a transfer of assets and subsequent withdrawal by a shareholder of a corporation is a loan and repayment or contribution to capital and dividend depends upon the intent of parties at the time the transfer and withdrawal were made. Funds or assets placed at the risk of the business are generally regarded as capital contributions; *153 whereas funds or assets advanced with reasonable expectations of repayment regardless of the success of the venture are usually considered to be loans. An additional hallmark of a bona fide indebtedness is the ability of the debtor to obtain a similar loan from an "outside investor." 2554-58 Creston Corp., 40 T.C. 932 (1963); see also Gilbert v. Commissioner, 248 F. 2d 339 (C.A. 2, 1957), remg. a Memorandum Opinion of this Court. In consideration of all the facts and circumstances surrounding the 1958 transfer, we conclude that the petitioner has failed to establish that an indebtedness arose as a result of the transfer of assets. The corporation, according to its income tax returns, was not prospering in 1956, 1957, or 1958, and there is no evidence to demonstrate that Mr. Hudlow had reasonable expectations of being "repaid" for the value of the assets. No certain time was fixed for "repayment"; moreover, such "repayment" could not have been expected within a short time, if ever. In fact, the disputed withdrawal did not occur until about 7 years later. Because of Hudlow's complete ownership of Arrow stock in 1958, and his nearly complete ownership thereafter, we do *154 not weigh heavily against him the fact that the purported loan was not evidenced by the full panoply of paperwork that usually accompanies a bank loan; however, in this case there is no evidence that the corporation carried the $10,800 on its books as a liability or a "loan payable." Furthermore, Mr. Hudlow's ownership interest gives rise to a powerful suggestion that he would not have pressed Arrow for "repayment" without regard to the success of its business ventures; rather, we think his intent was, at most, to withdraw the $10,800 in the event that the business was sufficiently successful to allow such money to be extracted from it without impairing it in any way. In short, there is not a shred of evidence other than Mr. Hudlow's testimony at trial that an indebtedness was intended in 1958, and we think the circumstances compel the finding that the assets were placed at the risk of the business. We agree with the respondent that the $10,800 should be included in Mr. Hudlow's income for 1965, the year in which he received the funds. 2a See Wood Preserving Corporation of Baltimore v. United States, 347 F. 2d 117 (C.A. 4, 1965), affg. 233 F. Supp. 600 (D. Md. 1964); *155 United States v. Durant, 324 F. 2d 859, 863 (C.A. 7, 1963), affg. 208 F. Supp. 890 (D. Ill. 1962), cert. denied 377 U.S. 906 (1964). As a further argument, the respondent contends that even if an indebtedness was created by the 1958 transfer, Mr. Hudlow's basis in such indebtedness would have been reduced in the event that his deductible portion of Arrow's net operating loss for 1958 exceeded his basis in the stock of that corporation. According to such theory, even if the 1965 withdrawals were a repayment of indebtedness, the amount of such repayment might nevertheless constitute taxable income rather than a return of basis, at least in some part. The respondent contends that, under the circumstances, Mr. Hudlow is not entitled to treat the a loan without showing that his *156 basis therein has not been reduced by virtue of section 1376(b)(2). However, in light of our conclusion that there was no indebtedness, we need not pass on the merits of this argument. Issue 3 Findings of Fact During 1964, 1965, and 1966, Arrow paid premiums for hospitalization insurance for the petitioner's father, W. C. Hudlow, Sr. 904 (Mr. Hudlow, Sr.), and for the petitioner's brother, James. One-half of each such premium was treated as an expense by Arrow and deducted on its income tax return for the year involved; the remaining half of each such premium was charged to the account receivable of the individual for whom it was paid on Arrow's books and records. The amounts of such premiums which Arrow paid and deducted on its income tax returns were as follows: for Mr. Hudlow, Sr., $63.20 in 1964, $92.68 in 1965, and $83.94 in 1966; for James, $88.72 in 1964, $100.18 in 1965, and $112.02 in 1966. Mr. Hudlow, Sr., then occupied the honorary position of chairman of the board of Arrow, and James was a shareholder, owning 0.5 percent of the stock. Both men occasionally recommended Arrow to friends who needed the services of a transfer company, for which they received no *157 salary. The respondent determined that the foregoing amounts of the premiums were improperly deducted by Arrow, and that they constituted dividend income to Mr. Hudlow. A journal entry in the books of Arrow shows that, on December 31, 1965, the amount of $1,241.29 was debited to "Bad Debts" and credited to "Accounts Receivable -James Hudlow." Of such amount, $434.67 represented Blue Cross and Blue Shield insurance premiums paid for James and charged to his account; the remainder represented moving expenses of James to and from Birmingham, Alabama. The journal entry on Arrow's books was accompanied by the description, "Write off charge made to James Hudlow A/C in error. Moving expenses to and from Birmingham and insurance which should have been charged to Jefferson Warehouse and Cold Storage Company (now liquidated)." The moving expenses reflected in this entry encompassed services rendered by Arrow on three occasions: November 1963, January 1964, and January 1965. James' move to Birmingham was made for the purpose of becoming the general manager of Jefferson in that city. His move "back" (presumably to Chattanooga; the record does not indicate) from Birmingham was made when the *158 operations of Jefferson were terminated. Arrow deducted the $1,241.29 as a bad debt in its income tax return for 1965; the respondent disallowed such deduction and included the amount thereof in Mr. Hudlow,s income for that year as a dividend. Opinion The issue for decision is whether the petitioner realized dividend income from Arrow by reason of that corporation's payments of hospitalization insurance premiums 1965, and 1966, and by reason of that corporation's failure to collect $1,241.29 from Jefferson on account of funds expended for, and services rendered to, James. Mr. Hudlow argues that the hospitalization insurance premiums paid in the 3 years were intended as compensation to Mr. Hudlow, Sr., and James for services rendered to Arrow, and that the amounts thereof should have been taxed to Mr. Hudlow, Sr., and James rather than to himself. The respondent argues that if Arrow had intended to compensate Mr. Hudlow, Sr., and James, it would have carried them on its payroll; he asserts that the petitioner authorized these payments, and that they were for his personal benefit. The respondent also notes that Arrow deducted the amounts as insurance expenses and not as salary *159 expenses, and asserts that the two men performed no services for Arrow that would not have been performed by any close relatives of a business owner. The petitioner testified that he directed Arrow to pay a portion of the premiums on the insurance for his father and brother because they referred business to the corporation from time to time. His testimony was general and included no specific instances of business resulting from their suggestions; yet, we accept the petitioner's statement that his father and brother did render some services for Arrow, and since the amounts involved are not substantial - ranging from $63.20 to $112.02 per man per year, we accept them as bona fide compensation for the services rendered. We so conclude, even though the recipients were related to the petitioner, the president and principal stockholder of Arrow, even though they were not employees of Arrow, and even though the payments were treated as insurance expenditures rather than as compensation on the books of Arrow. Accordingly, we hold that such payments were not dividends to Mr. Hudlow. With respect to the $1,241.29, the petitioner contends that Jefferson was indebted 905 in such amount *160 to Arrow because of Arrow's expenditures on behalf of, and services rendered for the benefit of, James, who was the general manager of Jefferson's operations in Birmingham. We need not restate the legal principles and authorities that we mentioned earlier with respect to when an indebtedness arises. It is sufficient to say that there is no evidence to show that any such indebtedness was ever intended. For all we know, Arrow did not even make a simple demand for the money. There was no evidence to show that Arrow did, or tried to, participate with Jefferson's other creditors in receiving payment out of the proceeds of Jefferson's remaining assets. The moving services, which constitute the more substantial part of the $1,241.29, included services performed as early as November 1963 and January 1964, a year and more prior to the cessation of Jefferson's operations. We were not shown that Arrow made any attempt to collect the value of such services during the remaining period of Jefferson's life. We are utterly unconvinced that Arrow made the expenditures for James' Blue Cross and Blue Shield premiums charged to his account, and for James' moving, with the intention and the realistic expectation *161 of being reimbursed by Jefferson; the facts are consistent only with the conclusion that Mr. Hudlow caused Arrow to make such expenditures for the benefit of himself, his brother, or his wholly owned and struggling corporation, Jefferson. We agree with the respondent that the $1,241.29 should be treated as dividend income to Mr. Hudlow; and since the petitioner made no alternative contention to the effect that such money should be treated as dividends in some year other than 1965, we sustain the determination that the dividends were received in 1965. Issue 4(a) Findings of Fact Chattanooga carried on its books a personal account receivable for Mr. Hudlow. The net increase in the balance of such account was $24,454.80 between January 1 and December 31, 1964, and $33,317.15 between January 1 and December 31, 1965. The balance of the account during those 2 years ranged from a low of $211.88 at the beginning of 1964 to a high of $57,983.83 at the end of 1965. One charge made to that account, under the date of July 6, 1964, was in the amount of $24,875.00; such amount represented Chattanooga's repayment to the Hamilton National Bank of funds which it had previously borrowed to enable *162 Mr. Hudlow to make the first partial repayment of the funds that he had borrowed from Albert Lea to enable Jefferson to pay its additional rentals and arrearages of withholding taxes, as previously discussed. Another charge made to that account, under the date of September 30, 1965, was in the amount of $25,705.50; such amount represented the funds used by Mr. Hudlow in 1964 to make the second and final partial repayment to Albert Lea. The latter amount had been charged first to Jefferson's account receivable on the books of Chattanooga when the repayment to Albert Lea was made; on September 30, 1965, that entry was reversed, and the same amount was charged to Mr. Hudlow's account with Chattanooga. With the alleged exception of those related to Jefferson, all the withdrawals were indisputably for Mr. Hudlow's personal benefit. During the 2-year period involved, the 13 credits to Mr. Hudlow's account receivable with Chattanooga (causing decreases in the amount of the outstanding balance) totaled $65,021.80, as compared with the 35 charges to such account (causing increases in balance) totaling $122,793.75. Of the credits to the account in such years, the two largest, totaling $43,000, *163 represented purported bonuses paid to Mr. Hudlow. When Mr. Hudlow wished to withdraw money from Chattanooga and charge it to his account receivable, he simply gave the bookkeeper instructions to that effect. On such occasions, she did not question Mr. Hudlow with regard to the terms by which he would repay such "advances." Chattanooga never charged Mr. Hudlow interest on the balance of such account; nor did it ever pay interest to Mr. Hudlow when such account had a credit balance, as it did for over 18 months during 1962 and 1963. No limitation existed with respect to how high the outstanding balance of the account could be. Other employees of Chattanooga had accounts receivable with that corporation for personal expenses at certain times; an "advance" on such account could be made only with Mr. Hudlow's approval. However, no employee who was not a director or officer of the corporation was allowed to withdraw more than $500 from the corporation in such a manner. Prior to the years in issue, there were occasional credits to the petitioner's 906 account receivable, as well as numerous charges, with the latter substantially out-numbering the former. For example, from April 29, 1960, through *164 the end of 1963, there were 48 charges made against the account, and 17 credits made to it. The most substantial credit entry during that period was made on March 1, 1962, in the amount of $73,000. Such credit entry immediately follows, on the corporate records of the account receivable, a charge entry dated the same day in the amount of $45,311.95. The $73,000 credit was the result of several transactions entered into by Mr. Hudlow in order to raise $100,000 cash; he had a building which was in his name but which was leased to Chattanooga, he sold the building to Southern and had that corporation in trun lease it to Chattanooga, he used the lease to borrow $55,000, and he transferred certain land from his own name to that of Chattanooga. The balance of Mr. Hudlow's account receivable with Chattanooga, as shown on the books of that corporation, was reduced from $82,906 to zero on September 30, 1966. Prior to such reduction, there had been 18 charges totaling $28,084.67 and 2 credits totaling $3,162.50 to the account in 1966. Such reduction was due in part to a transfer of $60,000 in cash from Southern to Chattanooga, which transfer was considered to be a loan from Southern to Mr. *165 Hudlow individually. Mr. Hudlow gave Southern an unsecured demand note for the amount of such transfer. At the time of trial, Mr. Hudlow had not repaid any part of the principal of such note to Southern. The remainder of the reduction in the balance of Mr. Hudlow's account receivable with Chattanooga was due to his transfer to that corporation of his individual unsecured demand note in the amount necessary to reduce the balance to zero. At the time of trial, Mr. Hudlow was unsure as to whether he had repaid any part of the principal of that note. However, he paid some interest to Southern and to Chattanooga on both of the notes. According to Chattanooga's Federal income tax returns, the amounts of its earned surplus was as follows as of September 30 in each of these years: 1961, $95,062.93; 1962, $83,032.20; 1963, $99,322.62; 1964, $136,086.20; 1965, $157,805.69; 1966, $168,988.02; and 1967, $202,672.11. The respondent determined that Mr. Hudlow received constructive dividends from Chattanooga to the extent of the net increase in the balance of the account receivable in 1964 and 1965, respectively. The petitioner contends that the withdrawals reflected by that account constituted *166 short-term loans to him from the corporation. Opinion The issue for decision is whether Mr. Hudlow realized dividend income in 1964 and 1965 to the extent of the net increases in those years in his account receivable with Chattanooga, or whether such increases represented loans. Once again, we are confronted with a question of fact, which must be resolved in light of the facts and circumstances surrounding the transaction. While there is no fixed rule of thumb for making the determination, there are some generally applicable criteria to guide us; the decisive question which must be ultimately resolved is what was really intended by the parties. Berthold v. Commissioner, 404 F. 2d 119, 122 (C.A. 6, 1968), affg. a Memoradum Opinion of this Court; Gooding Amusement Co. v. Commissioner, 236 F. 2d 159 (C.A. 6, 1956), affg. 23 T.C. 408 (1954), cert. denied 352 U.S. 1031 (1957); Elliott J. Roschuni, 29 T.C. 1193, 1201-1202 (1958), affd. 271 F. 2d 267 (C.A. 5, 1959), cert. denied 362 U.S. 988 (1960). *167 When the individual who withdraws the funds from the corporation is in control of it, such situation invites special scrutiny. Elliott J. Roschuni, supra at 1202; William C. Baird, 25 T.C. 387, 393 (1955); W. T. Wilson, 10 T.C. 251, 256 (1948). A distribution paid out of the earnings and profits of a corporation to its shareholders is a dividend, unless it is affirmatively established to the contrary. Sec. 316; W. T. Wilson, supra at 256; Rule 32, Tax Court Rules of Practice.
The facts of this case reveal a situation in which Mr. Hudlow withdrew funds from Chattanooga whenever he wanted, in whatever amount he wanted, for any reason he wanted, with no questions asked, without any official corporate authorization of a "loan," and without making any agreement, informal or otherwise, as to when repayment would be made. Mr. Hudlow was the only shareholder of Chattanooga, and was apparently the only one who enjoyed the privilege of taking such "advances" from the corporation, with the exception of employees who were occasionally permitted 907 to borrow sums of $500 or less with Mr. Hudlow's approval. The corporation had more *168 than ample earned surplus out of which the distributions to Mr. Hudlow could be made. The situation appears as if the sole shareholder was permitting himself to enjoy the fruits of his successful investment by means of cash distributions from the corporation, which he was under no constraint to repay. But for the existence of the account receivable, and the lack of a formal dividend declaration, both of which factors were within the unfettered control of Mr. Hudlow, the withdrawals under the circumstances we have described appear as quintessential dividends. See Ogden Co., 50 T.C. 1000, 1005 (1968), affd., 412 F. 2d 223 (C.A. 1, 1969). In support of his position, the petitioner argues that the account receivalbe with Chattanooga had been repaid in years prior to the ones in issue, and that the withdrawals in the years in issue were repaid in 1966. With respect to the earlier repayments, we note that the one which was by far the most substantial, and the one which resulted in the account's having a credit balance for over 18 months, was the $73,000 credit in March 1962. However, this credit was the result of Mr. Hudlow's transferring certain land owned *169 by him to Chattanooga, and a reasonable inference form his testimony is that at the time of the transfer, he withdrew over $45,000 in cash from Chattanooga. It seems highly likely that these transactions were motivated at least in substantial part by Mr. Hudlow's desire to obtain immediate cash, and was not significantly motivated by a feeling that he was required to repay his wholly owned corporation for previous withdrawals. We do not think that the occasional payments made to the account are sufficient to offset the other factors which indicate a lack of compulsion to repay. William C. Baird, supra at 395-396. The fact that Mr. Hudlow made payments to the account would be consistent with the possibility that he voluntarily elected to make such payments in order not to deplete Chattanooga's cash reserves; while such repayments are not irrelevant, they fall far short of proving that Mr. Hudlow had an obligation to repay the amounts of his withdrawals in the later years. Moreover, even though the withdrawals may have been considered loans in the earlier years, they may have been constructive dividends in the later years, nevertheless. George R. Tollefsen, 52 T.C. 671, 681 (1969), *170 affd. 431 F. 2d 511 (C.A. 2, 1970), cert. denied 401 U.S. 908 (1971). The account balance was seldom high prior to 1964, and when it reached a high level, it was generally quickly and substantially reduced. In contrast, the account balance showed a much steadier and substantial rise throughout the 2 years in issue and most of the succeeding year, with the repayments in that period being far less than the withdrawals, as we have previously set forth. Such a contrast gives rise to a suggestion that the account may have changed in character at some time during its existence but prior to the beginning of 1964; if the petitioner ever felt bound to repay the withdrawals, of which we are not convinced, we see no evidence of such feeling in the years with which we are here specifically concerned. Compare Victor Shaken, 21 T.C. 785, 793 (1954). With respect to the alleged repayment of the entire outstanding balance in September 1966, we note first that the "repayment" was achieved without a cent of cash flowing from Mr. Hudlow personally to Chattanooga; such repayment consisted in part of funds transferred from another corporation controlled by *171 Mr. Hudlow in return for his unsecured demand note to that corporation, and the remainder of the repayment consisted of Mr. Hudlow's unsecured demand note to Chattanooga itself. Even if this constituted a bona fide "repayment" to Chattanooga, we must consider, in determining what relevance the repayment bears to the withdrawals in 1964 and 1965, the fact that the repayment was made less than 2 months after the Internal Revenue Service agent commenced his examination of the petitioners in this case. In light of the foregoing facts, plus the fact that the September 1966 "repayment" was not at all typical of the activity in the account since the beginning of 1964, the lack of any indication that Mr. Hudlow ever before executed a note to Chattanooga to reflect the understanding that the account receivable was a debt, and the apparent fact that Mr. Hudlow had made no payments on the principal of either of the 2 notes that he executed incident to the "repayment" as of 3 1/2 years later, we think that the full "repayment" of the account in September 1966 may have been an attempt to 908 strengthen Mr. Hudlow's position in the anticipated tax dispute, and we conclude that the so-called *172 repayment was not an action that would have been taken in the ordinary course of events for the purpose of repaying Chattanooga for withdrawals of 1964 and 1965. Mr. Hudlow's actions with respect to the account receivable in 1964 and 1965 give no indication that such a complete "repayment" was intended. See Atlanta Biltmore Hotel Corp. v. Commissioner, 349 F. 2d 677, 680 (C.A. 5, 1965), affg. a Memorandum Opinion of this Court; Spheeris v. Commissioner, 284 F. 2d 928, 930-931 (C.A. 7, 1960), affg. a Memorandum Opinion of this Court, cert. denied 366 U.S. 944 (1961); Regensburg v. Commissioner, 144 F. 2d 41, 44 (C.A. 2, 1944), affg. a Memoranum Opinion of this Court, cert. denied 323 U.S. 783 (1944); George R. Tollefsen, supra at 680; William C. Baird, supra at 394-395. Compare Moses W. Faitoute, 38 B.T.A. 32, 36 (1938). In arguing this issue, the petitioner cited Albert Ravano, 26 T.C.M. 793, 36 P.-H. Memo T.C. par. 67,170 (1967), wherein it was stated that a sole shareholder can occupy a debtor-creditor relationship with his corporation, and that such relationship *173 will be recognized as such for tax purposes, if the shareholder can prove that he had the requisite state of mind at the time of entering into the transaction. We agree with this statement. See Moses W. Faitoute, supra at 35. However, in this case, the shareholder has fallen short of the required proof. We hold that the petitioner has not proved that he and Chattanooga intended that he would be obligated to repay the money that he withdrew from that corporation in 1964 and 1965. Issue 4(b) Findings of Fact Chattanooga carried two open accounts receivable on its books for Jefferson. The "regular" account was maintained from 1958 through 1965; the "special" account, from 1959 through 1965. After adjustments, the increase in the balance of the regular account in 1963 was $23,132.65. Jefferson's business operations terminated in February 1965; at the end of Chattanooga's taxable year in September 1965, substantially all of the balance of the regular account was charged off as a bad debt. Of the reductions in the account balance between those two occurrences, the respondent's analysis shows that $4,369.50 was directly traceable to money that was owed to Jefferson *174 by outside parties. When Jefferson needed cash to meet its expenses, it called Mr. Hudlow directly, and he instructed the bookkeeper for Chattanooga to send the money to Jefferson. In its unsound financial condition, Jefferson could not have borrowed the funds from any unrelated source. The only sources of repayment to which Chattanooga could look consisted of the proceeds of the sale of Jefferson's accounts and the proceeds of the liquidation of those assets which Jefferson owned free and clear. In fact, such assets were taken by Southern Railway Company as a part settlement of rents owed by Jefferson, and the accounts were sold for $10,000 or $12,000. Of the account proceeds, Mr. Hudlow thought that some part went to Chattanooga; the balance went to other creditors of Jefferson. Some of such other creditors were paid prior to Chattanooga. Jefferson's income tax returns showed the losses of $18,038.65 for the year ended June 30, 1962; $26,998.15 for the year ended June 30, 1963; and $71,736.63 for the year ended June 30, 1964. Chattanooga realized some business advantages by virtue of the existence of Jefferson; during certain years, Jefferson made profitable use of, and took *175 over the outstanding debt on, certain equipment which Chattanooga had but was not using. Futhermore, the good reputation that Jefferson established in the Birmingham area resulted in Chattanooga's obtaining some customers who knew of the common ownership of the two companies. The respondent determined that, in substance, Chattanooga distributed the money at the direction of and for the benefit of Mr. Hudlow, who in turn contributed it to the capital of Jefferson. The respondent therefore contends that Mr. Hudlow received dividend income in 1963 to the extent of $23,132.65, the amount of the increase in Jefferson's regular open account receivable with Chattanooga in that year. On the other hand, the petitioner emphasizes the business relationship between Chattanooga and Jefferson, and contends 909 that the advances created a valid indebtedness between the two corporations. Opinion Once again, we must decide whether the petitioner has proved the existence of an indebtedness; this time, the alleged debtor is Jefferson. Without repeating the principles of law that we have already discussed, along with the associated criteria and supporting authorities, it suffices to say that *176 the petitioner must show that Chattanooga viewed its advances to Jefferson as loans which the latter would be obligated to repay. We conclude that the petitioner has failed to so demonstrate. Financial arrangements between affiliated corporations invite close scrutiny. Kraft Foods Co. v. Commissioner, 232 F. 2d 118, 123 (C.A. 2, 1956), revg. on another issue 21 T.C. 513 (1954); Malone & Hyde, Inc., 49 T.C. 575, 578 (1968). We must evaluate whether there was a reasonable expectation of repayment under the particular circumstances of the case, taking into consideration the economic realitiies. Wilfred J. Funk, 35 T.C. 42 (1960); Caroline D. Thompson, 22 T.C. 507 (1954). Jefferson's financial straits made it impossible for such corporation to obtain loans from outside sources; this would be particularly true if the loans that it sought were unsecured loans, such as those which it allegedly received from Chattanooga. Jefferson's business losses were mounting with each successive year. Through Mr. Hudlow, Chattanooga was *177 necessarily aware of that situation, and it would be only under extraordinary circumstances that Chattanooga could have a bona fide expectation of being repaid for advances which it made to a corporation whose business fortunes were plummeting at the very time such advances were being made. By the figures revealed on its income tax returns, Jefferson's fiscal descent was obvious at the time Chattanooga commenced to make the advances here in dispute; indeed, Mr. Hudlow did not even contend that an upturn in Jefferson's business was anticipated. Rather, he contended that Chattanooga hoped for repayment out of the proceeds of the liquidation of Jefferson's assets. However, in our judgment, it has not been established that Chattanooga had a bona fide expectation of repayment of its advances to Jefferson out of those proceeds. The testimony shows that Chattanooga did not pursue Jefferson's assets with any particular zeal when such assets were being divided for the purpose of paying off Jefferson's creditors. It is true that there were some "repayments" to the account receivable in 1964 and 1965; nevertheless, over $18,000 was eventually written off by Chattanooga as a bad debt with respect *178 to the regular account alone. Partial "repayments" are often considered to be an indicator that a bona fide debt was intended, and rightly so in most cases. However, such indicator is relevant only when it supports the conclusion that the party making the repayments intended from the outset, and all along, to have incurred a genuine obligation. Where, as here, there is strong countervailing evidence, the occasional and partial "repayments" may be viewed as having been made at the option and election of the recipient of the advances; while the latter theory would generally be contrary to business practice, it must be borne in mind here that the "debtor" and "creditor" corporations had common ownership. In this connection, we repeat for emphasis that the essence of a debt is that there is an obligation to repay, and we are not convinced that this was the case here. The very name "account receivable" is of course connotative of a debt, but as we said with respect to the previous issue, the name assigned to the account is not of controlling significance when the party choosing the name stands to benefit taxwise by selecting nomenclature which does not conform to the reality of the situation. *179 Finally, the petitioner contends that Chattanooga "had a valid business purpose for attempting to assist Jefferson" because of the business advantages flowing to Chattanooga by reason of Jefferson's operations. With respect to such contention, we point out first that all of the income for the "rental" of equipment that Jefferson purportedly paid Chattanooga during 1963 appears to have consisted merely of charges to the account receivable. It is not clear to what extent the pre-1963 "rental" payments took that form. It is highly doubtful that such charges, as opposed to actual cash income, gave rise to any material benefit to Chattanooga; and although we did find that Jefferson helped to carry some of the debt outstanding on the equipment, we could make no finding as to the time that Jefferson provided such help. Conceivably, such help could have been given near the beginning of Jefferson's corporate 910 existence; furthermore, if such help had not been given, we know of no reason why Chattanooga could not have sold its unneeded equipment and eliminated the debt in that manner. Similarly, we do not know the extent to which Chattanooga benefited as a result of Jefferson's good *180 reputation, or when such benefit was conferred. In any event, the petitioner has not established any causal relationship whatever between any benefit realized by Chattanooga as a result of Jefferson's operations and the purported loan of funds by Chattanooga to Jefferson in 1963. This case is clearly distinguishable from Al Goodman, Inc., 23 T.C. 288 (1954), in which we held that the corporation served its own best interests by making a loan to a related party, in that case its controlling shareholder. See 23 T.C. at 301. In this case, it seems that the only significant benefit resulting from the alleged loans in 1963 inured to Jefferson and to Mr. Hudlow by reason of his ownership of Jefferson. Moreover, even if there was reason for Chattanooga to attempt to assist Jefferson, as the petitioner argues that fact alone certainly does not show that the assistance took the form of a bona fide loan. Such assistance could just as easily have been, as the respondent suggests, a series of dividends paid to Mr. Hudlow in order to enable him to make capital contributions to Jefferson. Even if we assume that the funds disbursed by Chattanooga by way of the account *181 receivable went directly to Jefferson, and never passed through Mr. Hudlow's hands, such assumption would not be inconsistent with the disbursements being dividends to Mr. Hudlow, if the funds were diverted at Mr. Hudlow's behest into the pocketbook of Jefferson. Biltmore Homes, Inc. v. Commissioner, 288 F. 2d 336, 340 (C.A. 4, 1961); affg. a Memorandum Opinion of this Court, cert. denied 368 U.S. 825 (1961). Furthermore, if the funds went directly to Jefferson, without the expectation of repayment, it stands to reason that such transfers were effected by Mr. Hudlow for his benefit, because he was the one who had the ability to control such transfers; Jefferson did not have the power to cause such transfers to be made. We cannot believe that Chattanooga would have made such transfers but for the personal wishes of Mr. Hudlow, as the transfers brought no significant corporate benefits to Chattanooga. Compare W. B. Rushing, 52 T.C. 888, 894 (1969), affd. - F. 2d - (C.A. 5, 1971). We hold that the increase in Jefferson's account receivable with Chattanooga in 1963 constituted, in substance, dividend income to Mr. Hudlow, as determined by the *182 respondent. Issue 4(c) Findings of Fact During 1964, Chattanooga disbursed amounts of $156.25 and $908.44 to Mr. Hudlow. Such amounts were posted to the account receivable maintained for Mr. Hudlow on Chattanooga's books and records in 1965, not 1964. Mr. Hudlow reported such amounts in his and his wife's joint income tax return for 1965, and not in the return for 1964. In his statutory notice of deficiency, the respondent determined that such amounts were income to Mr. Hudlow in 1964, and made a corresponding offsetting entry in the determination of Mr. Hudlow's dividend income for 1965, so that he would not be taxed twice for the receipt of the same amounts. The parties agree that the outcome of this issue should depend on our disposition of issue 4(a), which involved the treatment of Mr. Hudlow's account receivable. Opinion In issue 4(a), we held that the increases in Mr. Hudlow's account receivable with Chattanooga in 1964 and 1965 should be treated as dividend income to him. However, because it is here undisputed that the disbursements of $156.25 and $908.44 posted to the account in 1965 were actually made in 1964, we hold that such disbursements are includable in *183 Mr. Hudlow's dividend income for 1964 and not for 1965. Issue 4(d) Findings of Fact Chattanooga carried on its books and records an open account receivable for Tennessee during the years 1962 through 1969. The balance of the account rose from $1,261.51 at the beginning of 1963 to $81,621.87 at the end of 1965; the net increase in the balance was $21,490.39 in 1963, $36,322.85 in 1964, and $22,547.12 in 1965. All such advances to Tennessee during those years were made to enable the latter to pay for extensive and very costly repairs on a 911 yacht which it owned; Tennessee would have been unable to pay for such repairs otherwise. Mr. Hudlow had negotiated the purchase of such yatch when he was in Florida on a fishing trip. The only way Chattanooga could be repaid for its advances to Tennessee with respect to such yacht was if the charges for the yacht's use generated sufficient income to allow Tennessee to repay Chattanooga. However, although the yacht was used on occasion to entertain customers of Chattanooga, Tennessee never billed or charged Chattanooga for such use. Mr. Hudlow personally made the decisions as to how much money Chattanooga would advance to Tennessee *184 at any given time to cover repairs for the yacht. The captain of the yacht, who stayed on it at all times, was on Chattanooga's payroll; his salary and all related costs were charged by Chattanooga to Tennessee's account, which fact served to increase its balance. From 1962 through sometime in 1965, Tennessee's only employees were men who worked on the yacht; its office address was at the same place as Chattanooga's office, and its books were kept by a man who also worked for Chattanooga and Arrow. By September 30, 1966, the outstanding balance of Tennessee's account with Chattanooga had reached $100,419.19. On that day, such balance was reduced on the books to zero by reason of three credit entries to the account. The largest such entry, in the amount of $83,945.92, represented a note in that amount which was executed by Mr. Hudlow in his capacity as president of Tennessee. Such note recited that it was payable to Chattanooga on demand, with 6-percent interest on the principal. However, as of the time of trial, such note had not been paid. The yacht sank in 1968, and only some parts were salvaged. Its insurer paid Tennessee a settlement of $29,000, as well as allowing Tennessee *185 to keep the salvageable items from the yacht. Mr. Hudlow does not recall that any specific part of such settlement proceeds was used to pay off any of Tennessee's purported indebtedness to Chattanooga. The salvageable parts of the yacht remained in storage as of the time of trial, and such parts represented the total assets of Tennessee at that time. The log books kept with respect to the yacht listed Mr. Hudlow as its owner. Tennessee acquired the yacht on or about October 15, 1962, at a cost of $10,000. Tennessee spent, for improvements to the yacht, the sums of $4,840.18 in 1962, $23,893.61 in 1963, and $32,631.00 in 1964, for a total in those 3 years of $61,364.79. Tennessee's corporate income tax returns for 1962 and 1963 did not state its principal business activity; but its return for 1964 stated such principal activity to be "Charter Service." On those returns, Tennessee claimed deductions, other than those representing the depreciation on the yacht and the improvements to it, in the amounts of $206.12, $13,045.42, and $23,958.67, respectively. That corporation's total income for 1963 was reported as $1,800 derived from "Rents"; its total income for 1962 and 1964 was shown *186 on its returns to be zero. Such income tax returns listed Tennessee's net operating losses as $206.12 in 1962, $12,868.64 in 1963, and $28,262.98 in 1964. Sometime in 1965, Tennessee entered the machine shop business, and on its income tax return for that year, its principal business activity was listed as "Machine Shop," and its principal product or service as "Fabrication." However, for that year, Tennessee deducted $15,690.86 on its return for "Yacht operating costs," in addition to the depreciation taken on the purchase price of, and on the cost of the improvements to, such yacht. On its income tax returns for 1966, 1967, and 1968, Tennessee took deductions for "Yacht Operating Costs" in the respective amounts of $5,209.98, $2,840.29, and $24,460.23. Such deductions were over and above deductions claimed in those years for depreciation. Mr. Hudlow individually advanced funds to Tennessee through an open account during the years 1962 through 1966, over and above the funds that such corporation was receiving from Chattanooga. The account which represented the advances made by Hr. Hudlow individually to Tennessee had a balance of $800.00 at the end of 1962, $19,776.44 at the *187 end of 1963, $21,892.61 at the end of 1964, $15,977.86 at the end of 1965, and $15,528.46 at the end of 1966. Such account was maintained on Tennessee's records as an account payable to Mr. Hudlow. The respondent determined that the net increases in Tennessee's account receivable with Chattanooga in the years 1963, 1964, and 1965 should be treated as dividend income to Mr. Hudlow in such years. The petitioner contends that such increases constituted bona fide debts, and that Chattanooga had valid business purposes for making the alleged loans. 912 Opinion Again we must determine whether Mr. Hudlow's successful corporation Chattanooga was making loans or distributing its surplus; this time the alleged debtor is Tennessee. With reference to the legal principles and authorities that we have already discussed at length, we conclude, without great difficulty, that no indebtedness was intended between Chattanooga and Tennessee. The amount of money advanced, the financial condition of the recipient corporation at the time of the advances, and the apparent unlikelihood of repayment out of Tennessee's yachting activities, all weigh heavily against the petitioner's contention. During *188 the years here in issue, Tennessee's costs of maintaining the yacht required substantial transfusions of money from Mr. Hudlow individually as well as from Chattanooga. According to Mr. Hudlow, Tennessee hoped to realize profits from the operation of its yacht; but when Chattanooga used such yacht, it did not pay rent for such use. The petitioner has not shown that Tennessee received more than $1,800 in income with respect to the yacht from the time of its purchase in 1962 to the time of its sinking in 1968. Yet, Tennessee spent $10,000.00 to purchase the yacht; $61,364.79 for improvements on the yacht in the years 1962 to 1964; and $48,201.36 for "Yacht Operating Costs" in the years 1965 to 1968. The total of the foregoing expenditures is $119,566.15, and it does not include the operating costs of the yacht (aside from improvements) for 1962, 1963, and 1964. In those years, Tennessee claimed deductions other than depreciation in the total amount of $37,210.21, of which a very substantial part was undoubtedly attributable to the yacht. Furthermore, when the yacht finally sank, Chattanooga apparently displayed its characteristic lack of zeal in collecting its supposed "debts" from its *189 affiliates; as far as we know, none of the $29,000 that Tennessee received from the insurance settlement went to "repay" Chattanooga. Moreover, the "repayments" to Tennessee's account receivable with Chattanooga prior to the time that the respondent commenced his examination were few in number and relatively insignificant in amount, and we are not at all impressed by the purported complete repayment made less than 2 months after the examination was begun. Such repayment was made by means of a note signed by Mr. Hudlow in his capacity as president of Tennessee; the note remained unpaid at the time of trial, nearly 3 1/2 years later. The petitioner's contentions with respect to the alleged business relationship between Chattanooga and Tennessee is similarly unimpressive, as it was not shown that Chattanooga made use of the yacht on more than a few occasions. It can hardly be seriously contended that such limited usage of Tennessee's property was the reason for disbursements of such magnitude and consistency as those involved here. It seems certain that Chattanooga would have fared enormously better had it chartered a yacht from an outside party on those occasions when it desired the *190 use of such a craft for business entertainment purposes. Perhaps Chattanooga's usage of the yacht had some value, and to the extent of such value Chattanooga's payments to Tennessee could have been attributable to such usage, but there is utterly no evidence on which a rational conclusion as to the value of such use could be based. We cannot believe that Chattanooga's business interests could have been even colorably served by "lending" the amounts shown in the account receivable to Tennessee. To emphasize that we are not attempting to substitute our business judgment for that of Mr. Hudlow, we point out that we cannot believe that Mr. Hudlow himself ever contemplated a bona fide debt relationship under these circumstances. Helvering v. Nat. Grocery Co., 304 U.S. 282, 295 (1938). We conclude that the funds here in dispute were diverted from Chattanooga by Mr. Hudlow for the purpose of satisfying his personal desire to "own" the yacht. See Challenge Manufacturing Co.37 T.C. 650 (1962); American Properties, Inc., 28 T.C. 1100 (1957), affd. 262 F. 2d 150 (C.A. 9, 1958). We are not ignoring the fact that Tennessee was actually *191 the owner, but as Tennessee had no substantial business activities during the years here involved, except for the machine shop operation in 1965 which had nothing to do with the yacht, we think that Tennessee's ownership of the craft was for most practical purposes tantamount to Mr. Hudlow's personal ownership. We are not convinced that the yacht was ever intended to be the instrumentality of a profitable business venture. Therefore, it follows that Chattanooga's "advances" to Tennessee via the account 913 receivable were disbursements made for the personal benefit of Mr. Hudlow, and we sustain the respondent's determination of dividend income. Issue 5 Findings of Fact About 1960, a representative of the Pillsbury Company (Pillsbury), which was a good customer of Chattanooga, came to Mr. Hudlow and advised him that Pillsbury was in need of warehouse space. At that time, Chattanooga was unable to give Pillsbury more space in its present warehouse facilities, but Mr. Hudlow and his wife owned 5 acres of land adjacent to a railroad yard that he thought would be a good site to build a warehouse. In October and November 1960, Chattanooga and Pillsbury agreed on a set of terms *192 whereby Chattanooga would lease to Pillsbury a building which it contemplated erecting on the Hudlows' land. Such agreement provided for an 8-year lease with an option to renew for another 5 years; it also provided that Chattanooga could assign the agreement to another corporation, partnership, or individual, because Chattanooga was uncertain as to whether "we will construct the building, or if it will be constructed by another corporation in which we may be interested, or by an individual * * *." On March 25, 1961, Mr. Hudlow leased the land to Southern, a corporation which he had formed in about 1957. Such lease was to run for a period of 8 years from June 1, 1961, with an option to renew for 5 additional years, and it provided for an annual rental of $1,215. The lease was a "net lease," in which the tenant, Southern, was required to bear all expenses arising directly or indirectly from the lease and from Southern's occupancy of the premises. Inter alia, Southern was responsible for paying for repairs, taxes, and insurance pertaining to such premises. Southern then obtained an 8-year loan from an outside source to build a building on the land, and then proceeded to have such building *193 built. Also on March 25, 1961, Southern and Pillsbury entered into a lease agreement for a term of 8 years after the completion of the construction, with an option for renewal for a further 5-year period. The lease called for an annual rental of $65,382.72. The construction of the warehouse building was completed on September 1, 1961, at a cost of $352,630.71. Southern financed the building by means of a loan from an insurance company in the amount of $360,000, payable in 10 years. On April 21, 1961, Mr. and Mrs. Hudlow entered into a trust agreement with Sam H. Campbell III, a very close friend and business associate of Mr. Hudlow, as trustee. Such trust, which was stated in the agreement to be irrevocable, was for the benefit of the Hudlows' daughter, Nancy T. Hudlow, who was about 13 years old at the time. The Hudlows put into the trust their interest in the March 1961 lease agreement between Mr. Hudlow and Southern. Mrs. Hudlow ratified such lease agreement, as far as her interest was concerned. The trust was to run until May 1, 1971, or Nancy's death, whichever occurred first, at which time the corpus of the trust was to be distributed to the settlors or their survivors. *194 While the trust was operative and while Nancy was under 21, the trustee was authorized to pay to her or for her benefit as much as he deemed advisable of the trust income. When she reached 21, any income accumulated in the trust was to be paid to her, and thereafter she was to receive the net income of the trust at regular intervals. The trustee was also permitted to pay over any portion of the income which he deemed advisable to Nancy's parent or guardian, and such trustee was not required "to see to the application of any such sum so paid over." The terms of the agreement also empowered the trustee to "sell, lease, pledge, mortgage, encumber, transfer, exchange, convert, or otherwise dispose of or grant options with respect to any and all property * * * at any time held in trust hereunder * * *." The trust paid tax on the income received from Southern's lease of the land. The respondent determined that such income, in the amounts of $2,430 in 1964 and $1,215 in 1965, should be included in the income of Mr. and Mrs. Hudlow, rather than that of the trust. [3]
*195 Pillsbury later desired still more space, so Southern made an addition to the building, and Southern and Pillsbury executed another lease agreement to cover such addition. The latter agreement was made in October 1965. This lease was to run for a period of 5 years, with three additional renewal options of 1 year each, and then a further renewal option for 5 years. The 914 addition to the building was completed on September 1, 1966, at a cost of $126,799. The income tax returns for the trust were prepared by the same accountant that filed the Hudlows' personal returns in that particular year. Such accountant forwarded the returns to the trustee, Mr. Campbell, who then executed them. Southern had no office and no employees during the years in issue; its books were kept in the offices of Chattanooga. Opinion The issue for decision is whether the Hudlows or the trust is taxable on the income from the lease with respect to which Mr. Hudlow was the lessor and Southern was the lessee. The outcome turns upon whether the Hudlows' transfer of their interest in the lease to the trust succeeded in shifting the tax liability. It is well settled that *196 one who is entitled to receive income at a future date cannot avoid tax liability on such income by making a gift of it by anticipatory assignment. The power to dispose of income - even if such power is exercised by causing the income to be paid to another - is the equivalent of ownership for tax purposes. Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 267 (1958); Harrison v. Schaffner, 312 U.S. 579 (1941); Helvering v. Horst, 311 U.S. 112 (1940); Helvering v. Clifford, 309 U.S. 331 (1940); Burnet v. Leininger, 285 U.S. 136 (1932); Lucas v. Earl, 281 U.S. 111 (1930); Paul A. Teschner, 38 T.C. 1003 (1962); Eugene T. Flewellen, 32 T.C. 317 (1959). The owner of the income-producing property realizes the economic gain from the income by directing its disposition in a manner which serves his own ends or accords with his wishes. Commissioner v. Sunnen, 333 U.S. 591 (1948); Drake University, 44 T.C. 70, 72 (1965). That result is the same regardless of whether the assignment of income is an irrevocable *197 assignment, and regardless of whether the income is assigned for a substantial period of time. Galt v. Commissioner, 216 F. 2d 41, 48 (C.A. 7, 1954), affg. on this point 19 T.C. 892 (1953), cert. denied 348 U.S. 951 (1955); Drake University, supra at 72. The question here is whether the Hudlows' assignment of their interest in the lease to the trust should be treated as tantamount to a mere assignment of income. An affirmative answer to such question in similar factual circumstances was given in United States v. Shafto, 246 F. 2d 338 (C.A. 4, 1957), with which we agree. The taxpayer in that case made an irrevocable assignment of a lease with respect to which he was the lessor, but he retained for himself the reversionary interest in the realty. The court concluded that "only the right to the rents passes to the assignee * * *" in such a situation, and it was not impressed by the taxpayer's argument that the assignee became clothed with the power to enforce the provisions of the lease and collect the rents. It noted that the assignee was empowered to collect the rents from the property, while the assignor retained *198 the responsibility for making improvements to it and paying expenses with respect to it. In the case at hand, the assignee was similarly free from responsibility with respect to the leased premises, because of the assignor's having placed such responsibilities upon the lessee by virtue of the lease provisions. The similarity between the two cases, in this respect, lies with the fact that the assignee has nothing whatsoever to do with the leased property except collect the income from it; and in both cases, the reversionary interest was unaffected by the assignment. In the present case, as in Shafto, we think the assignment transferred only the right to receive income in the future, and we think that Mr. Hudlow realized economic benefit by virtue of having controlled the disposition of such future income and having caused it to be paid to the natural object of his bounty. The petitioner does not cite a single case or authority to support his position. He notes the fact that the trustee had the power to transfer or assign the leasehold interest; but under the circumstances here present, we to not see how the trustee's power was any different than the power held by the donee in Helvering v. Horst, supra. *199 In either case, the recipient could dispose of or transfer what he had, but in each case, the focal point of the issue is, what is it that the recipient has acquired? Such question takes precedence over the subsidiary question of what the recipient could do with what he had. And, in the present case as well as in Horst, the answer to that crucial question is that the recipient 915 had only a naked right to receive income in the future. Because of the terms of the Hudlow-Southern lease, the trustee in the case at hand was completely free from, and unencumbered by, any responsibilities pertaining to the realty. Like the donee in Horst, the trustee in this case had only to collect the income. In this case, even more so than in some leasehold situations, it can truly be said that the lease represents "nothing more than * * * the right to future rental payments * * *." Hort v. Commissioner, 313 U.S. 28, 32 (1941), as cited in Arthur T. Galt, 19 T.C. 892, 904 (1953), affd. on this point 216 F. 2d 41 (C.A. 7, 1954), cert. denied 348 U.S. 951 (1955). Unlike the taxpayer in Blair v. Commissioner 300 U.S. 5 (1937), *200 Mr. Hudlow did not divest himself of his entire interest in the property. It was, after all, the real property and not the lease which was the underlying source of the income. Arthur T. Galt, supra at 904. Like the taxpayer in United States v. Shafto, supra, he simply assigned the income (or the "fruit") for a period of years, while reserving the reversionary interest in the property (or the "tree") for himself. See Lyon and Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P.G. Lake Case," 17 Tax L. Rev. 295, 329-333 (1962). We recognize that Arthur T. Galt, supra, and Drake University, supra, are not factually identical to the present case, but we believe that their holdings lend support to the conclusion we reach here. Similarly, we are mindful of a statement of dictum in Helvering v. Horst, supra, wherein the Supreme Court, in distinguishing Blair v. Commissioner, supra, said at 119: Unlike income thus derived from an obligation to pay interest or compensation, the income of the trust was regarded as no more the income of the donor than would be the rent from *201 a lease or a crop raised on a farm after the leasehold or the farm had been given away. * * * We believe that by linking the situation in which a leasehold is given away with a situation in which a farm is given away, the Supreme Court showed that it contemplated a traditional type of leasehold in which the lessor had some distinct responsibilities and burdens in addition to his right to collect the income, and in which the assignee or donee of the leasehold was required to assume such a position of responsibility. We cannot accept the interpretation that the Supreme Court intended its statement to apply to a leasehold situation such as that involved here, in which the transferee of the leasehold got the right to collect future income without any of the attendant responsibilities of a landlord. Compare Lum v. Commissioner, 147 F. 2d 356 (C.A. 3, 1945), affg. in part and revg. in part a Memorandum Opinion of this Court, with United States v. Shafto, supra. Furthermore, we are well aware of the provisions of section 673 which have the effect of providing that a grantor of a trust will not be taxable on the income of such trust merely because of his *202 reversionary interst if the reversion cannot reasonably be expected to occur within 10 years. However, the committee reports on subpart E (sections 671-678) stated explicitly that it does not apply in situations which, like Helvering v. Horst, supra, involve assignments of future income. S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 365 (1954). Moreover, section 1.671-1(c), Income Tax Regs., provides that "the provisions of subpart E do not apply in situations involving an assignment of future income, whether or not the assignment is to a trust." We hold that the petitioner is taxable on the income from the Hudlow-Southern lease, as determined by the respondent. Chattanooga Warehouse and Cold Storage Company Docket No. 661-69 Issue 6 Findings of Fact Chattanooga maintained on its books and records two accounts receivable for Jefferson; as we previously discussed, these accounts consisted of a regular account and a special account. Chattanooga wrote off the money due from Jefferson on such accounts as bad debts. On September 30, 1965, Chattanooga wrote off $17,876.70 with respect to the regular account *203 and $5,000.00 with respect to the special account, for a total of $22,876.70 in bad debt deductions for the taxable year ended on that day. On September 30, 1966, it wrote off $320.58 with respect to the regular account as a bad debt deduction for the taxable year ended on such day. All of such bad debt deductions were disallowed in full by the respondent. 916 The regular account was the subject of substantial discussion in issue 4(b) of the docket pertaining to Mr. and Mrs. Hudlow. The special account contains only three entries: a charge in the amount of $7,500 dated August 31, 1959; a credit in the amount of $2,500 dated July 18, 1960; and a final credit in the amount of $5,000 reflecting the write off of such amount as a bad debt. Thus, in substance, only two transactions ever occurred with respect to such account. Opinion We must determine whether Chattanooga is entitled to a bad debt deduction with respect to amounts which were transferred by such corporation to Jefferson via two accounts receivable, designated as the regular account and the special account, and which Jefferson failed to repay. It is axiomatic that a bad debt deduction can arise only when there is *204 a bona fide debt. Both parties, on brief, appear to regard this issue as the other side of the coin from the matter involved in issue 4(b) in the Hudlows' individual case. In issue 4(b), we held that net distributions from Chattanooga to Jefferson via the regular account in 1963 in the total sum of $23,132.65 constituted dividends to Mr. Hudlow, and not bona fide loans to Jefferson. The present issue involves a total of $18,197.28 written off as bad debts from the regular account; obviously, the amount written off from that account as a bad debt was less than the amount of increment to such account which we have already held to be dividends to Mr. Hudlow. The arguments advanced by the petitioner with respect to this issue are those which we considered and rejected in issue 4(b); clearly, the petitioner has made no attempt to show that the $18,197.28 of alleged bad debts attributable to the regular account is not part and parcel of the $23,132.65 that we have already found to be a dividend. In any event, he has not shown that the sum here involved should be treated differently than that which we dealt with in issue 4(b). Therefore, with respect to the $18,197.28, we hold that the *205 bad debt deduction is not allowable for the reason that such sum has not been shown to have been a debt. With respect to the $5,000 of alleged bad debts attributable to the special account, the petitioner has not made a separate argument and has not shown that the factual circumstances surrounding that account were materially different. No evidence whatsoever has been introduced with respect to such account other than the fact of its existence and the dates and amounts of the recorded transactions. As we said earlier, this Court is bound to apply special scrutiny to advances made between related corporations. Of course, this does not mean that such advances cannot be shown to be loans in the most bona fide sense; but nevertheless, the close relationship should put the taxpayer on notice to offer whatever evidence is available to him to prove that the substance coincides with the form, if in fact it does. In the special account, one partial "repayment" or offsetting payment was made less than 11 months after the original advance; after that, the transferee corporation remained in business for 4 1/2 more years, and no further "repayments" were made. The account remained dormant until *206 its balance was finally written off as a bad debt. Moreover, as we said earlier, both the transferor and transferee corporations were wholly owned by the same individual, the transferee corporation was thinly capitalized, it may very well have been unable to obtain loans from unrelated sources, and finally, it is extremely doubtful whether the common stockholder, Mr. Hudlow, intended that Jefferson would be obligated to repay to Chattanooga the amount of the purported advances under any and all circumstances. Much of what we said in issue 4(b) with respect to the regular account is applicable here, and we find that the petitioner has not carried his burden of proof with respect to the special account. We conclude that the respondent correctly disallowed the bad debt deductions claimed by Chattanooga with respect to the money that purportedly had been advanced to Jefferson. Issue 7 Findings of Fact According to Chattanooga's Federal income tax returns for the taxable years ended on September 30 of the following years, its gross receipts, taxable income, amount of compensation paid to Mr. Hudlow as president, and amount of compensation paid to Mr. D. V. Windsor as secretary-treasurer *207 were as follows: 917 Gross
Taxable
Comp.
Comp.
Year
Receipts
Income (Loss)
Hudlow
Windsor
1962
$ 610,572.68
[12,221.28)
$12,000.00
$12,200.00
1963
709,466.29
19,269.00
11,450.00
11,450.00
1964
789,028.31
53,004.15
35 ,100.00
10,100.00
1965
853,703.52
26,760.84
36,000.00
12,200.00
1966
903,399.93
9,608.42
12,000.00
12,000.00
1967
1,013,571.93
50,811.79
31,000.00
13,171.50
1968
980,079.05
0
13,000.08
12,000.00 Messrs. Hudlow and Windsor were the only compensated officers of Chattanooga in all of the years mentioned above except the year ended September 30, 1968, in which Mr. Leven Turner received $12,000 in compensation as the vice president, according to the Federal income tax return. During the years ended September 30, 1964 and 1965, Mr. Hudlow's stated salary from Chattanooga was $10,100 and $11,000, respectively, with an amount of $25,000 designated as a bonus in each year. In each such year, Chattanooga deducted the sum of the salary and the bonus as compensation paid to Mr. Hudlow; the respondent disallowed those bonuses to the extent of $22,600 per year as unreasonable and excessive compensation. *208 In the year ended September 30, 1964, the only bonuses paid by Chattanooga to employees, other than the bonus of $25,000 to Mr. Hudlow, consisted of two bonuses of $200 each and one of $100. Mr. Windsor was one of the recipients of a $200 bonus. The three bonus recipients in that year other than Mr. Hudlow received total compensation from Chattanooga of $10,000 or $10,100 each. In the year ended September 30, 1965, the only bonuses paid by Chattanooga to employees, other than the bonus of $25,000 to Mr. Hudlow, consisted of three bonuses of $1,200 each, one of which was paid to Mr. Windsor. The three bonus recipients in that year, other than Mr. Hudlow, received total compensation from Chattanooga of $12,200 each. In the year ended September 30, 1966, Chattanooga paid four bonuses of $1,200 each; one of such bonuses went to Mr. Hudlow, and another to Mr. Windsor. The total compensation paid by Chattanooga to each of its four bonus recipients was $12,000. Mr. Hudlow began working in the transfer and storage business in 1947, shortly after completing his education. From the start, he manifested an ability to operate such a business successfully and in a very profitable manner. *209 In 1949, he bought out the business in which he had initially been employed, and since then, he has at all times owned, in substance, at least one company engaged in the transfer and storage business. He caused Chattanooga to be formed in 1952. During the years in issue here, Mr. Hudlow was the president and sole shareholder of Chattanooga. He had his own office in Chattanooga's offices. In such capacity, he worked daily, beginning at about 8:30 or 9:30 a.m. Chattanooga has five different locations, and Mr. Hudlow visited each of them periodically. He answered mail, checked on the cash receipts and disbursements with the bookkeeper, performed services with respect to hiring and firing personnel, and performed selling activities for the corporation, which required him to travel. He also performed services with respect to negotiating contracts, determining rates, and talking to potential customers. He reviewed the weekly reports of the comptroller. He discussed all major policies with his assistant, who was in charge of the office in Mr. Hudlow's absence. The amount of Mr. Hudlow's bonus in each year was directly related to the amount that the corporation could afford to pay in that *210 year. The large "bonuses" were paid because the corporation could afford to pay them and because Mr. Hudlow "felt like my salary should be brought in line with executives doing the same amount of work in a company that was doing the same type of volume, that had the same responsibilities that I had * * *." During the years in issue, Mr. Hudlow also was the president of Arrow and performed services for it on a daily basis, and he rendered occasional services for M & M. Opinion We must decide to what extent Chattanooga is entitled to a deduction for compensation to Mr. Hudlow for services rendered during the taxable years in issue. 918 Section 162(a)(1) allows a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered." Section 1.162-7, Income Tax Regs., requires that the amount of the deduction represent "payments purely for services," as opposed to being a distribution of dividends on stock, and limits the amount of the allowable deduction for compensation to "what is reasonable under all the *211 circumstances." The petitioner has the burden of proving the reasonableness of the compensation, and the question is one of fact, to be determined from all the facts and circumstances of the particular case. Botany Worsted Mills v. United States, 278 U.S. 282 (1929); Dahlem Foundation, Inc., 54 T.C. 1566, 1579 (1970); Boyle Fuel Co., 53 T.C. 162, 169 (1969). The question of reasonableness of compensation is inseparably tied to the question of whether the alleged compensation is not really a dividend in disguise. Irby Construction Company v. United States, 290 F. 2d 824, 826 (Ct. Cl. 1961). However, even if a payment of alleged compensation is reasonable in amount, it is still not deductible if it was actually a distribution of earnings as contrasted with compensation for services rendered. Northlich, Stolley, Inc. v. United States, 368 F. 2d 272, 278 (Ct. Cl. 1966); Irby Construction Company v. United States, supra at 827; Klamath Medical Service Bureau, 29 T.C. 339, 347 (1957), affd. *212 261 F. 2d 842 (C.A. 9, 1958), cert. denied 359 U.S. 966 (1959). Thus, it is relevant to inquire whether the payments were actually intended as compensation, as opposed to being a device for the distribution of corporate profits. Challenge Manufacturing Co., 37 T.C. 650, 663 (1962). In determining the reasonableness of the alleged payment of compensation, the relevant criteria to consider include: the amounts ordinarily paid for similar services by similar businesses, the expertise of the employee, the amount of the employee's time devoted to the employer's business, the volume of the employer's business and the amount of its earnings, and, when the employer is a closely held corporation and the employee is a substantial stockholder, whether the corporation regularly pays dividends. Salem Packing Co., 56 T.C. 131, 145 (1971). Also worthy of consideration are the salary policy of the employer as to all employees, and, in the case of small corporations with a limited number of officers, the amount of compensation paid to the particular *213 employee in previous years. Mayson Mfg. Co. v. Commissioner, 178 F. 2d 115, 119 (C.A. 6, 1949), revg. a Memorandum Opinion of this Court Dahlem Foundation, Inc., supra at 1580. A bonus which might reasonably be paid to a nonshareholder employee could very well be unreasonable when paid to a shareholder employee, because, in the latter case, the corporation has no need to pay a bonus in order to provide the employee with an incentive to put forth his best efforts on his employer's behalf. City Chevrolet Company v. Commissioner, 228 F. 2d 894 (C.A. 4, 1956), affg. per curiam a Memorandum Opinion of this Court, cert. denied 351 U.S. 939 (1956); Northlich, Stolley, Inc. v. United States, supra at 278; Irby Construction Company v. United States, supra at 827; University Chevrolet Co., 16 T.C. 1452, 1455 (1951), affd. 199 F. 2d 629 (C.A. 5, 1952). We shall first consider the various criteria for determining the reasonableness of the amount of the alleged compensation. No helpful evidence has been introduced by either party with respect to what compensation was ordinarily *214 paid for services such as those rendered by Mr. Hudlow to Chattanooga, in that geographical area, at that time. However, we think that Mr. Hudlow's ability to perform well in his executive capacity has been amply demonstrated. We do not doubt that he was in large measure responsible for the corporation's apparent success. However, Chattanooga did not receive the benefits of Mr. Hudlow's efforts on a full-time basis; during the years in issue, he performed services daily for Arrow, rendered occasional services to M & M, and served as the president of Arrow, Jefferson, Tennessee, and Southern, and as a director of Arrow, Tennessee, and Southern, in addition to his presidency and directorship of Chattanooga. While we believe that Chattanooga was the most substantial single business interest of Mr. Hudlow, is it inconceivable that all of these other business interests, combined, did not occupy some substantial portion of his time and thoughts and attention. During the first year here in issue, Chattanooga's gross receipts were approximately $789,000, a rise 919 of nearly $80,000 from the previous year, and its taxable income was approximately $53,000, more than two and a half times *215 that of the previous year. In the second year here in issue, the gross receipts rose to nearly $854,000, but the taxable income dipped to below $27,000; such taxable income figure was still favorable as compared to each of the 2 years preceding the first year here in issue. However, as we mentioned previously, Chattanooga declared no formal dividends. With respect to Chattanooga's policy regarding other employees, we know that it was not nearly so generous with its nonshareholder employees. The second-in-command in Chattanooga's heirarchy, Mr. Windsor, the secretary-treasurer, received compensation that varied very little over a period of 7 years between October 1, 1961, and September 30, 1968. His compensation during that period fluctuated only within the boundaries of $10,100.00 and $13,171.50. Furthermore, in the first year here in issue, Mr. Hudlow received a bonus of $25,000 and Mr. Windsor received a bonus of $200; Mr. Hudlow's bonus was 125 times the size of the bonus awarded to the officer who was immediately junior to him. In the second year here in issue, Mr. Hudlow's bonus of $25,000 was nearly 21 times the size of Mr. Windsor's $1,200 bonus. Clearly, we are not convinced *216 that Chattanooga had a general policy of rewarding its employees when the corporation enjoyed a good year. In fact, it is interesting to note that Mr. Windsor's total compensation was $12,200.00 for the year ended September 30, 1962, when the corporation reported a loss of $12,221.28; and his total compensation was $10,100.00 for the year ended September 30, 1964, when the corporation reported a taxable income of $53,004.15. Furthermore, Mr. Hudlow has introduced no evidence from which we could conclude that Mr. Windsor's duties were of vastly lesser significance than his own. Moreover, it seems that the substantial variations in Mr. Hudlow's alleged compensation over the years were determined largely if not entirely by the amount of the corporate profits; there is no indication whatsoever that there was any corresponding variance in his duties or responsibilities, or in the number of hours he worked. We do not disbelieve that Mr. Hudlow, and Chattanooga, felt that his services were worth more than the basic salary being paid to him, and wished to correct the disparity by means of a bonus, particularly in light of the corporation's rising fortunes. On the other hand, we cannot ignore *217 Chattanooga's lack of a generally applicable policy to reward its responsible employees in profitable years. The fact that the only employee who benefits handsomely from the corporation's ability to pay more is the sole shareholder gives rise to a strong inference that at least a sizable portion of the suddenly increased "compensation" is in substance a distribution of profits. Such inference is only strengthened by the fact that a relatively small portion of Mr. Hudlow's purported compensation was the basic salary that the corporation was to pay him for his servies in any event, whereas a much greater payment was occasioned by the substantiality of the corporation's profits. The large bonuses were not paid pursuant to a pre-arranged contractual agreement which was established as an incentive and which was consistently applied over a long period of years, as was the case in Mayson Mfg. Co. v. Commissioner, supra, wherein the Sixth Circuit allowed the deduction of the bonuses paid. Moreover, unlike the single-minded efforts of many highly compensated business executives, Mr. Hudlow's working hours were divided; and while he testified as to what time he began work daily *218 for Chattanooga, he said nothing with respect to how many hours he worked, either for Chattanooga or for all of his business enterprises combined. We believe that the amount which Mr. Hudlow's services were reasonably worth to Chattanooga, and which Chattanooga intended to pay to Mr. Hudlow as compensation for such services, lies between the figure allowed by the respondent and the figure claimed by Chattanooga. We have given full consideration to all of the factors we have mentioned, and to the arguments of the parties, and while we recognize the difficulty of measuring with precision the value of a man's services and the extent to which the corporation intended to compensate him for such services, we conclude and hold that Chattanooga intended to pay Mr. Hudlow $25,100 for his services in the taxable year ended September 30, 1964, and $26,000 for his services in the taxable year ended September 30, 1965, and that such amounts did not exceed the reasonable value of such services. To the extent of $10,000 per year, we sustain the respondent's determination that part of the alleged compensation was unreasonable and was intended to be a distribution of profits rather than compensation. *219 920 Issue 8 Findings of Fact On July 31, 1966, Tennessee transferred certain equipment to Chattanooga. Such transfer was reflected by a credit of $17,024.01 on September 30, 1966, to the account receivable maintained on the books and records of Chattanooga for Tennessee. The amount of $17,024.01 was the aggregate cost of such equipment. On its income tax return for the year ended September 30, 1966, Chattanooga claimed a deduction for depreciation on such equipment in the amount of $2,905.63. Of the equipment thus transferred, Chattanooga was able to use all but three lathes, which cost $6,974.37, $4,145.66, and $1,982.14, respectively. All other items of equipment involved in that transfer were still being used by Chattanooga at the time of trial. The respondent disallowed in full the deduction claimed for depreciation on the ground that the transferred equipment was not used in the trade or business of Chattanooga, nor was it property held for the production of income, within the meaning of sections 167 and 179. However, on brief, the respondent concedes that Chattanooga is entitled to depreciation for the last 2 months of its taxable year, i.e., the period remaining *220 between the time that the equipment was transferred by Tennessee to Chattanooga and the end of the taxable year, for all of the equipment transferred except the three aforementioned lathes which were not used in Chattanooga's business. Opinion Because of the concession made by the respondent, we need only decide whether Chattanooga is entitled to any deduction in excess of that conceded. A taxpayer is entitled to deduction for depreciation with respect to property used in its trade or business, or held by it for the production of income. Sec. 167(a). The period for the depreciation of an asset begins at the time the asset is placed into service; a proportionate part of one year's depreciation is allowable for that part of the first year during which the asset is in service. Sec. 1.167(a)-10(b), Income Tax Regs.
Both parties agree that Chattanooga is not entitled to claim depreciation as to the lathes costing $6,974.37 and $4,145.66; but Chattanooga contends that it did use the lathe costing $1,982.14 in its business. However, according to Mr. Hudlow's *221 own testimony with respect to the latter item, "we attempted to use it but did not have anybody qualified to use it and could not justify the cost of using it." We have concluded that such lathe was not used in Chattanooga's business; attempted use is not tantamount to actual use. The petitioner has not seriously contended that such lathe was held for the production of income and we hold that Chattanooga is not entitled to any deduction for depreciation with respect to that item of equipment. The only other question is the time element: for what part of the year ended September 30, 1966, is Chattanooga entitled to a deduction with respect to the items of equipment which it used? The respondent asserts that the depreciation deduction which Chattanooga claimed was based on the use of the equipment for the entire year; we have no other evidence with respect to whether that is so. In any event, the petitioner has made no argument to the effect that Chattanooga is entitled to a depreciation deduction under section 167 for that portion of the year during which it did not own the equipment, and we conclude that its deduction under section 167 is limited to that which the respondent has *222 conceded. Issue 9 Findings of Fact In January 1966, Chattanooga paid $2,385 to Yearby Concrete Finishing Company for services and material used in connection with the pouring and finishing of a concrete floor in a cold storage room. In April 1966, Chattanooga paid $12,599.84 to Industrial Trucks, Inc., in connection with work done on three pallet, or forklift, trucks. The cold storage room involved here was located on premises with respect to which Chattanooga was the lessee. The floor dimension of such room was about 55 feet by 100 feet. It had a concrete floor which was higher around the edges of the room, and sloped down toward the drains which were built in. The drains were helpful when the room was being washed down, and when the room was used for the storage of such items as ice-packed turkeys and certain types of produce which resulted in water getting on the floor. However, as a result of the way the concrete floor had been installed to accommodate the drains, the thickness of the concrete was not 921 uniform; rather, the concrete was made much thicker (5-6 inches) around the outside walls of the room and thinner (about 1 inch) around the drains. Over a period *223 of time, with heavy usage, the floor became cracked and broken in the vicinities of the drains. Also, a layer of foam glass insulation material beneath the concrete was damaged further whenever a forklift truck was operated on a spot where the concrete was broken. As a result, the room became unusable. Chattanooga asked the lessor to do the necessary work to get the room in usable condition again, but the lessor refused to do so on the grounds that "this is operational maintenance, this is caused by your own people." To restore the floor to its original condition would have necessitated taking up all of the remaining concrete and insulation, as well as the "sub floor." Such work would have cost $40,000. Instead of that, Chattanooga had the workmen remove the bad spots of the floor and pour concrete over what remained. Such work enabled Chattanooga to resume its use of that cold storage room. Chattanooga had for several years experienced mounting repair bills with respect to its electric forklift trucks. Numerous problems with the trucks resulted in their frequently being unserviceable, and when such trucks could not be used, other operations of the business were disrupted. Finally, *224 Chattanooga decided that it would either have to find out what was causing the problems with the trucks and have them repaired, or else get different trucks. The service representative of the dealer which handled these electric forklift trucks agreed to take three of Chattanooga's trucks and go over them and perform the work necessary so that they would no longer break down frequently. Such work was to be performed on a cost-plus basis, and the cost of the repairs was financed over 2 or 3 years, with the title to the trucks given as security. The cost of such trucks when new was about $14,000 each. In Mr. Hudlow's opinion, the pouring of the concrete floor did not increase the value of the building in which the cold storage room was located, but did increase the value of Chattanooga's leasehold interest therein, and the work done on the forklift trucks did increase their value. Chattanooga deducted both the $2,385.00 and the $12,599.84 as repair expenses on its income tax return for the year ended September 30, 1966. The respondent disallowed such deductions; he determined instead that such expenditures were capital in nature, and that Chattanooga was entitled to a deduction of *225 $4,244.50 for that year as depreciation on such items. Opinion The issue for decision, with respect to each of the two expenditures we have described, is whether the expenditure may be treated as a currently deductible repair expense under section 162, as the petitioner contends, or whether it must be regarded as a capital expenditure within the scope of section 263. If the latter is true, then Chattanooga's deductions are limited to depreciation, as the respondent has determined. Section 1.162-4, Income Tax Regs., provides as follows: The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment, or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the *226 life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept. However, section 263(a) provides that no deduction is allowable for amounts paid "for permanent improvements or betterments made to increase the value of any property or estate," or for "[any] amount expended in restoring property * * *." Section 1.263(a)-1(b), Income Tax Regs., states that the foregoing descriptions generally include amounts paid "to add to the value, or substantially prolong the useful life, of property owned by the taxpayer, such as plant or equipment," but do not include amounts paid "for incidental repairs and maintenance of property * * *." The petitioner has the burden of proving that the amounts here in issue were currently deductible expenses, rather than capital expenditures. Henry M. Rodney, 53 T.C. 287, 319-320 (1969); Challenge Manufacturing Co., 37 T.C. 650, 662 (1962). *227 In deciding the question of repair expenses vis-a-vis 922 capital expenditures, we look to the purpose for which an expenditure is made in order to determine its nature. A repair expense is made merely to keep the property in an operating condition over its probable useful life; it does not add to the value of the property or appreciably prolong its life. In contrast, when work is performed to prolong the life of the property, increase its value, or make it adaptable to a different use, the cost of such work is a capital expenditure. Jason L. Honigman, 55 T.C. 1067, 1081 (1971); Oberman Manufacturing Co., 47 T.C. 471, 482 (1967). Of course, any properly performed repair adds value to the property as compared to the situation immediately before the repair was done, but "the proper test is whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." Oberman Manufacturing Co., supra at 483; see also Plainfield-Union Water Co., 39 T.C. 333, 337-338 (1962). *228 If the work simply restores the taxpayer's property to its former ordinarily efficient operating condition, then it is in the nature of a deductible repair. Southern Ford Tractor Corporation, 29 T.C. 833, 845 (1958). Apparently, when the concrete was poured, the drains in the floor were eliminated. The petitioner contends that the value of the room was actually decreased by the pouring of the concrete, because the drains were no longer there to perform their useful function. On the other hand, the respondent argues that the previously existing floor with the nonuniform thickness of concrete was an inherently inadequate facility and that such inadequacy, rather than ordinary use, was the cause of the floor's deteriorating to the point of becoming unusable. As a result of the pouring of the concrete with a uniform thickness, the respondent contends, the floor was made adequately sturdy, which it had not previously been, and therefore the work brought about a permanent improvement of the facility and made the room better suited for the purpose for which it was used. It seems likely that both parties' contentions have some merit; we believe that the utility and value of *229 a facility such as this one would be increased by having drains in the floor, but of course it would also have a greater value if its floor was of sound and stout construction rather than being thin and vulnerable in some places. Becauses of these offsetting considerations, we conclude that the value of the facility after the repair was not materially increased as compared to what it had been prior to the time that it had been rendered unusable; we think that the increment in value of either the facility or the leasehold interest was only that which always follows from the performance of a properly done repair, as we recognized in Oberman Manufacturing Co., supra, and Plainfield-Union Water Co., supra. The petitioner's position with respect to the pouring of the concrete is consistent with the fact of the lessor's refusal to remedy the condition of the floor. Obviously, the lessor's characterization of the needed work as "operational maintenance" was self-serving, and does not control the tax consequences to the lessee, Chattanooga. Nevertheless, the lessor's characterization certainly does not support the respondent's theory that the needed work was *230 in the nature of a permanent betterment, to replace something which had previously been inadequate. As we view the situation, the lessor's refusal to act caused Chattanooga to be confronted with a choice: it could undertake to remove the existing floor, including the sub-surface layer and perform a complete restoration; or it could simply cover over what was there by pouring in concrete. It chose the latter course of action, which was more in the nature of a cheap, expedient, fix-up job, and less in the nature of a permanent and enduring improvement to the facility. We conclude, as a matter of fact, that the pouring of the concrete over the pre-existing floor in Chattanooga's leased facility was done for the purpose of restoring such facility to its previously useful condition, and not to bring about a material increase in the value of the facility, or to substantially prolong its life. Such conclusion is consistent with those in Oberman Manufacturing Co., supra, with respect to work done to a roof, including a structural change, to prevent it from leaking; Plainfield-Union Water Co., supra, with respect to cleaning and installing a cement lining in the *231 taxpayer's water pipe; Southern Ford Tractor Corporation, supra, with respect to filling and grading a lot; Midland Empire Packing Co., 14 T.C. 635 (1950), with respect to lining the walls 923 and floor of the basement of the taxpayer's building; and American Bemberg Corporation, 10 T.C. 361 (1948), aff d 177 F. 2d 200 (C.A. 6, 1949), with respect to drilling and grouting expenditures to prevent a cave-in of the taxpayer's warehouse building after the wooden piles on which it rested were damaged by dry rot. In Phillips & Easton Supply Co., 20 T.C. 455 (1953), the expense of installing a new floor in the taxpayer's building was held to be a capital expenditure. There, however, the old floor was 46 years old, and had so deteriorated that further repairs were not practical; such old floor had been previously patched in various places. The new floor was a replacement of the old one, and we think that the facts in that case are akin to what would have been the situation had Mr. Hudlow chosen the more expensive route of bringing about a complete restoration of the floor in his storage room. However, he did not do *232 so, and we think that his action in pouring concrete over the old floor is factually distinguishable from what the taxpayer did in Phillips & Easton Supply Co. The respondent has cited Alexander Sprunt & Son, Inc., 24 B.T.A. 599 (1931), revd. on other grounds 64 F. 2d 424 (C.A. 4, 1933), for the proposition that the cost of replacing an inadequate structure which no longer serves its intended purpose with a better and more substantial structure of the same type must be treated as a capital expenditure. However, we do not feel that such case is apposite with respect to the present situation; the taxpayer in Alexander Sprunt & Son, Inc., replaced a wooden wall with a concrete wall, whereas Chattanooga simply poured more concrete over a pre-existing concrete floor. For the foregoing reasons, the $2,385 which Chattanooga paid to Yearby Concrete Finishing Company constitutes a deductible repair expense in the year in issue. However, the situation with respect to the work done on the forklift trucks is altogether different. The facts as we have found them leave us with the unmistakable impression that the machines were substantially worn out, and that the *233 work done by Industrial Trucks, Inc., was in the nature of an overhaul, which served to prolong the life of the machines and to increase their value. The cost of the work performed on the trucks to get them operating again each time they broke down might have qualified as repair expenses; but the amount involved here represented the replacement of major parts, not just to repair a breakdown, but to put the machines into such condition that they would no longer be unduly susceptible to breakdowns. See West Virginia Steel Corporation, 34 T.C. 851, 859 (1960). The cost of this work was financed over a period of years, with the title to the machines given as security, similar to the procedure used when purchasing new machinery. Mr. Hudlow testified expressly that he thought the work done to the forklift trucks increased their value. We hold that the $12,599.84 paid to Industrial Trucks, Inc., was clearly a capital expenditure, and that the only deduction to which the petitioner is entitled in the year in issue with respect to such expenditure is the amount of depreciation. The petitioner did not contend that the respondent erred with respect to the amount of depreciation *234 he allowed in connection with this expenditure, so we hold that the petitioner is entitled to such amount only. Issue 10 Findings of Fact A representative of Pet Milk Company (Pet) contacted Mr. Hudlow in the offices of Chattanooga, and advised him that certain merchandise of Pet valued at $152.05 had been damaged while stored with Jefferson; such representative was aware of Mr. Hudlow's connection with Jefferson. Although Mr. Hudlow was aware that Jefferson was liable for such amount as the bailee of Pet's merchandise, he advised the Pet representative that Jefferson might not be able to pay the claim unless and until it received certain money from the sale of assets. Pet replied that if the bill was not paid immediately, Pet would discontinue doing business with Chattanooga. Mr. Hudlow did not think Chattanooga was liable for such amount because its only relationship to the incident causing the damage was the common stock ownership of both corporations; but because of Pet's insistence that Chattanooga make the payment, Mr. Hudlow caused it to do so. Such payment, in the amount of $152.05, was made in July 1966, and Chattanooga deducted that expenditure on its income tax return *235 for that year. The respondent disallowed such deduction. 924 Opinion The issue for decision is whether Chattanooga can deduct, as an ordinary and necessary expense incurred in its trade or business, the sum of $152.05 which Mr. Hudlow caused it to pay to Pet. To the extent that Chattanooga was simply paying a debt owed by Jefferson, such payment, of course, would not be deductible as a business expense of Chattanooga, as we have made amply clear by our holdings in previous issues in this case. However, if Chattanooga made the payment because to do so was appropriate and helpful to directly benefit itself, this factor casts a different light on the situation. We accept Mr. Hudlow's testimony that Chattanooga made the payment because Pet, an apparently substantial customer of Chattanooga, demanded that such payment be made or else it would stop doing business with Chattanooga. A payment is "ordinary" within the purview of section 162(a) when it falls within a common practice in the business community; and it is "necessary" within the meaning of the same subsection if the expenditure *236 was motivated by the intent that it would result in a business benefit. Allen Industries, Inc. v. Commissioner, 414 F. 2d 983, 984-985 (C.A. 6, 1969), affg. a Memorandum Opinion of this Court. With respect to the "ordinary" aspect, we conclude that the payment was made, in substance, for the purpose of favorably influencing, and retaining the good will and patronage of, a customer of Chattanooga. It cannot be doubted that businessmen often spend sums comparable to that involved here to achieve the same end, whether by entertainment, gift, or some other means. With respect to the "necessary" aspect, we think it is clear that Chattanooga made the payment in order to advance its own business interests. Obviously, Mr. Hudlow personally did not receive any benefit or gratification as a result of the payment; and Jefferson, which had ceased operations early in 1965, could not have benefitted from this payment, which was made in July 1966. In causing Chattanooga to make the payment, Mr. Hudlow exercised reasonable and prudent business judgment on behalf of such corporation. We hold that the deduction is allowable as claimed. Issue 11 Findings of Fact In August or September *237 1966, Mr. Hudlow contacted the firm of Swafford & Taylor with respect to doing certain accounting work for Chattanooga, pertaining to its taxable year ended September 30, 1966. They then agreed upon the hourly rate to be paid for such services. Such firm began its work in September of that year, but "a large bulk of the work" was done after the taxable year ended, and after the books were "closed" for that year. For such work, Swafford & Taylor [4] ultimately charged, and Chattanooga paid, $2,250. Chattanooga deducted such amount on its return for the year ended September 30, 1966, as legal fees accrued in that year. The respondent disallowed the deduction for the reason that "no legal services had been rendered for which you had a liability at the close of the fiscal year." Opinion The issue for decision is whether Chattanooga *238 is entitled to a deduction for accounting work which pertained to the year in which the deduction was taken, but most of which was performed after the end of such year, when the only predetermined aspect of the fee was the hourly charge. The ultimate total liability of Chattanooga to Swafford & Taylor could be determined only after the work had been completed and the number of hours had been ascertained; there is no indication whatsoever that Chattanooga knew at the end of the taxable year in which the deduction was claimed how many hours the work would consume. Paragraph (a)(2) of section 1.461-1, Income Tax Regs., provides, in part, that: Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy. * * * Clearly, in this situation, there was no way for Chattanooga to determine, by the close of the taxable year ended September 30, 1966, what its liability to Swafford & Taylor 925 would *239 be with respect to the accounting services, the "large bulk" of which had not yet been performed, where payment was to be on an hourly basis. Such determination could not be made with the "reasonable accuracy" contemplated by the regulation; indeed, the petitioner does not even contend that such a determination was possible. See Cold Metal Process Co., 17 T.C. 916, 933 (1951), affd. without opinion (C.A. 6, 1952). Similarly, it is clear that all of the events giving rise to the liability which ultimately totaled $2,250 had not occurred by the end of the taxable year. See Shepherd Construction Co., 51 T.C. 890, 898 (1969). The petitioner's argument is that the liability should be deducted against the income for the taxable year ended September 30, 1966, because the work performed "related entirely" to such year. However, Chattanooga did not cite a single legal authority for its theory; it has shown us no reason to depart here from the general rule that expenses incident to the conduct of a business are deductible when paid or accrued. Lanova Corporation, 17 T.C. 1178, 1186 (1952). The expenses here were neither paid nor accrued as of the *240 end of the taxable year in issue; Chattanooga does not even claim to have been able to make a reasonable estimate at such time of what its liability would be. We conclude that Chattanooga has not shown that it was entitled to the deduction claimed. The petitioner makes no alternative claim for a deduction with respect to that portion of the accounting work which actually was performed prior to the end of the taxable year in issue. For all we know, it is possible that no part of the liability became fixed until the accounting services were concluded in their entirety, a fact which certainly did not occur until the subsequent taxable year; moreover, even if the liability for the hourly fee accrued as the work was performed, on an hour-by-hour basis, we have no basis on which we could even estimate roughly how much of the work was performed prior to the end of the taxable year in issue. Therefore, we sustain the respondent's determination disallowing the deduction. Issue 12 Findings of Fact Mr. Hudlow, Sr., stored certain articles of merchandise in Chattanooga's cold storage plant. He operated a restaurant in the city of Chattanooga known as the Home Plate. Chattanooga billed *241 the charges for the merchandise storage to the Home Plate. On certain occasions when customers of Chattanooga went to the Home Plate to eat, Mr. Hudlow, Sr., recognized such people as customers of his son's business and bought their dinner for them. Also, Chattanooga has occasionally entertained people at the Home Plate, "with and without charges." During the taxable year ended September 30, 1966, Chattanooga "charged off" the amount of $146.34 shown on its books as the amount owed by the Home Plate for storage services, and Chattanooga deducted such amount as a bad debt on its income tax return for that year. The respondent disallowed the bad debt deduction. At trial, the petitioner abandoned the bad debt contention, but indicated that the Home Plate's storage charges were eliminated because of the entertainment provided for, and the courtesies extended to, Chattanooga's customers at such restaurant. Opinion The issue for decision is whether Chattanooga may deduct the sum of $146.34 which it "expended" by eliminating the storage fee charged to the Home Plate. Mr. Hudlow's testimony indicates that the elimination of the Home Plate's liability was not based on a belief that Chattanooga *242 was actually indebted to the restaurant or to Mr. Hudlow, Sr., for an amount equal to the storage charge. On the basis of this record, it appears that Chattanooga cancelled the liability of the Home Plate because of Mr. Hudlow's reluctance to have his wholly owned business collect money from his father, or from a business owned by the latter. While the Home Plate's role with respect to entertaining Chattanooga's customers may have contributed to such reluctance, Mr. Hudlow's overall pattern of conduct during the years in issue leads us to believe that the family relationship between himself and his father played a predominant role in the decision to cancel the liability. However, even if we were to assume the facts most favorable to the taxpayer, and believe that Chattanooga wrote off the Home Plate's storage charges because it felt obligated to reimburse such restaurant in an equal sum for the entertainment of its customers, we think that Chattanooga's attempt to deduct the amount of such 926 reimbursement ran afoul of section 274, and the regulations thereunder. The petitioner presented not a single shred of evidence, oral or written, with respect to the details of entertainment *243 and meals allegedly furnished by the Home Plate to Chattanooga and its customers without charge - not a single name, date, amount, or business purpose. Accordingly, we uphold the determination of the respondent with respect to Chattanooga's deduction of the amount owed to it by the Home Plate. Arrow Transfer and Storage Company Docket No. 662-69 Issue 13 Opinion The issue to be decided is whether Arrow can deduct insurance premiums which it paid for Mr. Hudlow, Sr., and James. All of the relevant facts are stated in the case of W.C. Hudlow, Jr., and Jo Ann Hudlow, issue 3. The conclusion we reached there governs the present issue. Because we found that the premiums were intended to be compensation to Mr. Hudlow, Sr., and James, for services rendered to Arrow, it follows that Arrow can deduct those amounts. Issue 14 Findings of Fact This issue involves amounts which Arrow paid to Mr. Hudlow in 1965, and which Arrow deducted as compensation for Mr. Hudlow's services. Many of the relevant facts are stated in the case of W.C. Hudlow, Jr., and Jo Ann Hudlow, issue 2. Arrow's income tax returns for the years 1963 through 1966 show that during that entire period, Mr. Hudlow *244 was the president of the corporation and devoted part of his time to Arrow's business, and one Llen Hodge was the vice president of the corporation and devoted all of his time to Arrow's business. Mr. Hodge also served as the general manager of Arrow. In 1963, Arrow deducted $9,600.00 as compensation to Mr. Hudlow and $6,414.66 as compensation to Mr. Hodge; in 1964, $9,600.00 as compensation to Mr. Hudlow and $6,960.88 as compensation to Mr. Hodge; in 1965, $22,648.99 as compensation to Mr. Hudlow and $8,955.00 as compensation to Mr. Hodge; and in 1966, $9,600.00 as compensation to Mr. Hudlow and $10,117.39 as compensation to Mr. Hodge. Under the category of "Expense account allowances," such returns list nothing paid to Mr. Hudlow, but they show payments to Mr. Hodge in the amounts of $442.47 in 1964, $296.46 in 1965, and $289.55 in 1966. Rounded to the nearest thousand, Arrow's reported gross receipts were $218,000 in 1963, $264,000 in 1964, $324,000 in 1965, and $377,000 in 1966; its reported taxable income was $2,000 in 1963, $18,000 in 1964, $19,000 in 1965, and $22,000 in 1966. Mr. Hudlow's personal office was located a block and a half from Arrow's offices. Mr. Hudlow conferred *245 daily with Arrow personnel who were regularly on the corporate premises. He also kept in contact with the men who did the selling and the dispatching from Arrow, and occasionally he called on Arrow's customers. The respondent disallowed $11,848.99 of Arrow's claimed deduction for compensation to Mr. Hudlow in 1965 as unreasonable and excessive; the remainder of $10,800.00 was allowed. Opinion We must decide the extent to which the $22,648.99 paid by Arrow to Mr. Hudlow in 1965 constituted reasonable compensation for his services, and the extent to which such amount was intended to be paid for his services. The respondent has allowed Mr. Hudlow's basic stated salary of $9,600.00 per annum plus one bonus of $1,200.00 as compensation; the dispute is focused on the two additional items of $10,800.00 and $1,048.99, which we discussed with respect to the individual petitioners. We decided that the amounts of such items were includable in Mr. Hudlow's income, without passing judgment on whether they were dividends or compensation. The amount which the respondent concedes should be treated as compensation in 1965 is in excess of the amount claimed by Arrow as compensation to Mr. Hudlow *246 for each of the years 1963, 1964, and 1966. Arrow's gross receipts and taxable income rose steadily throughout that entire period; the reported compensation to Arrow's fulltime, nonshareholder vice president rose in a similar manner. However, the reported compensation to Mr. Hudlow was identical for 1963, 1964, and 1966, but was more than double the usual amount for 1965. Furthermore, as we stated with respect to the reasonable compensation issue in Chattanooga's case, Chattanooga was the most substantial business interest of Mr. Hudlow, and he 927 apparently devoted the greater part of his time to directing its activities. Mr. Hudlow's own office was one and a half blocks from Arrow's offices. Although we believe he kept in touch daily with Arrow's operations, it is clear that the amount of his time devoted to Arrow was very substantially less than that which is usually devoted by a corporate president. It is significant that Mr. Hudlow did not even offer an estimate as to the percentage of his time which he devoted to Arrow. Arrow did have a responsible full-time officer; Mr. Hodge occupied the position of vice president at least since 1963, the earliest year with respect to *247 which we have information. In the performance of his duties in 1964, 1965, and 1966, Mr. Hodge sustained expenses which warranted the corporation's granting him an expense account allowance. Mr. Hudlow offered evidence with respect to the general nature of his services for Arrow, and most of such evidence is incorporated in our findings of fact. However, he gave no explanation of why his services in 1965 should have been worth more than 1963, 1964, and 1966. We are completely at a loss to understand how such a disparity could be warranted; the compensation of the nonshareholder vice president did not change in a similar manner. We conclude that the rise in Mr. Hudlow's alleged compensation, to the extent disallowed by the respondent, was not warranted, and we hold that the amounts of $10,800.00 and $1,048.99 were dividends to Mr. Hudlow. He has completely failed to show that his services were reasonably worth, and that Arrow intended to pay for such services, more than $10,800.00 in 1965. The respondent's determination is sustained. Issue 15 Opinion The issue to be decided is whether Arrow can deduct, as a bad debt, the amount of $1,241.29 which it set up on its books as a *248 claim against Jefferson for moving James to Birmingham and back, and for premiums on Blue Cross and Blue Shield insurance for James, and which it charged off. Arrow claims that Jefferson was indebted to it for such amount, and that such debt became worthless in 1965. All of the relevant facts were set forth in the case of W.C. Hudlow, Jr., and Jo Ann Hudlow, issue 3. There, we concluded that there was no genuine indebtedness, and that the amount should be treated as dividend income to Mr. Hudlow. Such conclusion governs this issue, and it follows that Arrow is not entitled to any deduction with respect to these expenditures. Issue 16 Findings of Fact This issue involves a deduction of $1,597.50 for allegedly accrued legal fees which Arrow deducted on its income tax return for 1966. Such fees were related to work done by the firm of Swafford & Taylor. Except for the amount and the different ending date of the taxable year, the relevant facts are the same as those presented in the case of Chattanooga Warehouse and Cold Storage Company, issue 11. The respondent disallowed the deduction "for the reason that no legal services had been rendered for which you had a liability at December 31, 1966." *249 Opinion By agreement of the parties, the decision of this issue must be the same as the decision of issue 11, the Chattanooga case. We agree that the legal question presented is the same, and we sustain the respondent's determination disallowing the deduction. Southern Land and Development Company Docket No. 663-69 Issue 17 Findings of Fact This issue involves the amortization of the cost of the warehouse building which Southern had built on land it leased from Mr. Hudlow; this is the same building which Southern in turn leased to Pillsbury, on an 8-year lease with a 5-year option to renew. Some of the relevant facts are stated in the case of W.C. Hudlow, Jr., and Jo Ann Hudlow, issue 5. Prior to March 24, 1961, Mr. Hudlow owned all of the 1,250 outstanding shares of Southern. However, on that date, Southern issued two certificates of ownership of such stock, which had no par value. One certificate recited that Mr. %hudlow was the owner of 987 shares, and the other, that James was the owner of 263 shares. James gave Mr. Hudlow his personal note, dated March 15, 1961, by which he (James) promised to pay Mr. Hudlow the sum of $5,260 on demand, with 6-percent interest. *250 James had little income, and did not have enough money to pay for the stock. The note was unsecured. As of the time of trial, 928 James had made no payment on the principal of such note, and Mr. Hudlow had not reported the supposed "sale" of the stock on his income tax return. When Mr. Hudlow withdrew $60,000 in cash from Southern, in return for his unsecured demand note payable to that corporation, in order to enable him to reduce the balance of his personal account receivable with Chattanooga, James offered no objection to such withdrawal. The date of the purported stock transfer was set to coincide with the beginning of the construction of the building. The amount of stock transferred to James was set at approximately 21 percent on the advice of counsel, who told Mr. Hudlow "that if I did not own all this corporation, owned less than eighty percent, that then we could set up the depreciation in the manner in which it was so set up on the books." James is 12 years younger than Mr. Hudlow, and on occasion he has worked for Mr. Hudlow in the latter's various enterprises, doing "leg work" wherever he was needed, and taking care of details that Mr. Hudlow did not have time to *251 look after. After the purported stock transfer, James held the title of vice president of Southern, as did Mr. Hudlow, Sr., but Southern paid no compensation to its officers. Mr. Hudlow, Sr., was a director of such corporation, but James was not. The building leased to Pillsbury was one of simple construction, with a concrete floor, and a steel structure supporting the roof. Its exterior walls were built of concrete block. The concrete block walls have had some problems with cracking and settling, and part of the front wall has been rebuilt for this reason. In 1968, Pillsbury indicated that it might be interested in buying the premises that it was leasing, and Mr. Hudlow and Southern indicated that they would sell to Pillsbury both the building and the underlying land for a price of $650,000. On its Federal income tax returns for each of the years 1961 through 1966, Southern claimed a deduction for depreciation on the original warehouse building using a 13-year period, and the sum-of-the-years-digits method. The 13-year period represented the term of the lease with Pillsbury, plus the renewal period. On its return for 1966, Southern claimed a deduction for depreciation on the addition *252 to the building, using the same method, but an 8-year period. The respondent determined that Southern is entitled to deductions for depreciation on the building based on a useful life of 30 years, and for depreciation on the addition based on a useful life of 25 years. Opinion The issue for decision is the length of time over which Southern is entitled to depreciate the building, and the addition thereto, which were the subject of the lease to Pillsbury. Because Southern itself is a lessee with respect to the land on which the improvements were built, it seeks to take advantage of section 178(a), which in relevant part, allows a lessee to amortize the cost of improvements on the leased property over the term of the lease and the term for which such lease can be renewed by the lessee. However, section 178(a) provides that the general rule which it sets forth is applicable "[except] as provided in subsection (b)." Section 178(b) states, in part: (b) Related Lessee and Lessor. - (1) General rule. - If a lessee and lessor are related persons (as determined under paragraph (2)) at *253 any time during the taxable year then, in determining the amount allowable to the lessee as a deduction for such taxable year for * * * amortization in respect of any building erected (or other improvement made) on the leased property, the lease shall be treated as including a period of not less duration than the remaining useful life of such improvement. (2) Related persons defined. - For purposes of paragraph (1), a lessor and lessee shall be considered to be related persons if - * * * (B) The relationship between the lessor and lessee is one described in subsection (b) of section 267, except that, for purposes of this subparagraph, the phrase "80 percent or more" shall be substituted for the phrase "more than 50 percent" each place it appears in such subsection. For purposes of determining the ownership of stock in applying subparagraph (B), the rules of subsection (c) of section 267 shall apply, except that the family of an individual shall include only his spouse, ancestors, and lineal descendants. 929 One of the categories of related taxpayers as defined in section 267(b) is: *254 (2) an individual and a corporation more than 50 percent in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual; Thus, the question for the purpose of this issue is whether Mr. Hudlow (the lessor) and Southern can be described as "an individual and a corporation 80 percent or more in value of the outstanding stock of which is owned, directly or indirectly, by or for such individual." If so, then Mr. Hudlow and Southern will be considered as "related persons" for purposes of section 178, and section 178(a) will not be applicable. However, if Mr. Hudlow owns less than 80 percent in value of such stock, and his brother owns the remainder, then Mr. Hudlow and Southern will not be considered to be related persons. Sec. 1.178-2(b), Income Tax Regs. Because of the specific provision of section 178(b)(2) with respect to "the family of an individual," for purposes of determining the ownership of stock, any shares owned by James cannot be considered as being constructively owned by Mr. Hudlow by virtue of their sibling relationship. According to the stock certificates issued by Southern, Mr. Hudlow owns in number 78.96 *255 percent of the outstanding stock of the corporation. The theory of permitting a lessee to amortize the improvements he constructs on leased property over the period of the lease and its renewals is based on the premise that the lessee will have the use and enjoyment of such improvements only during that period. See H. Rept. No. 775, 85th Cong., 1st Sess. (1957), 1958-3 C.B. 811, 822. If the lessee's own use of his capital asset is limited to 13 years, for example, because that is the outer limit of his leasehold interest, it is merely of academic interest to such lessee that the asset has a far longer physical life. When the lease period ends and the lessee is required to vacate the premises, the useful life of the improvement as far as he is concerned is absolutely at an end. In section 178, Congress has given statutory recognition to this business reality. However, by the exception stated in section 178(b), Congress has given a similarly realistic recognition to the situation in which the lessor and lessee represent closely related interests; in such case, it seems logical that the enjoyment of the asset would not necessarily be cut off from the party who constructed *256 it at the end of the lease period, as it would be when the parties to the lease are unrelated. The Senate Finance Committee was mindful of this difference: Where the lessee and lessor are strangers, writing the improvement off over the leased period, which is shorter than the improvement's life, presents no particular problem since the lessee in such cases is unlikely to be making gifts to the lessor. Thus, any improvement with a life longer than the lease period might well be reflected in lower lease payments. However, where the lessee and lessor are closely related and thus may be willing to permit value to be transferred from one to the other, permitting the cost of the improvement to be written off over the lease period alone may in effect be merely a way of obtaining rapid depreciation. As the criterion for whether the interests of the lessor and the lessee are closely enough related so as to warrant the application of the exception, Congress has laid down the test of a stock ownership of "80 percent or more in value." Having thus stated the criterion and the reasons for imposing such a test, we now reach the question of whether Mr. Hudlow did in fact own 80 percent in value *257 of the outstanding stock in Southern. The petitioner indicates that the question is answered completely by the fact that, according to the stock certificates issued by Southern, Mr. Hudlow owned less than 80 percent, in number, of the outstanding shares. The petitioner says not a word about the statutory language "in value." The respondent advances a two-pronged argument: (1) That Mr. Hudlow was the actual owner of all of the stock, because the transfer to James was in effect a sham, and (2) even if James did own the stock which the petitioner claims he owned, Mr. Hudlow nevertheless owned more than 80 percent in value of the outstanding stock, because of the relative lack of power that inhered in the minority stock interest under such circumstances. There may be merit in the respondent's first argument. The evidence suggests that James may have held the stock in his name merely as a nominee for Mr. Hudlow. There is no evidence establishing that James exercised any of the usual rights of, or received any of the usual benefits of, a bona fide shareholder; it is not clear 930 that he held the stock in his name for his own use and benefit. That James appears to have consistently *258 played a subordinate role in his participation in Mr. Hudlow's businesses, and that Mr. Hudlow withdrew $60,000 from Southern for personal reasons without any objection by James, are consistent with such argument. However, we need not pass upon the merits of such argument because of Mr. Hudlow's singular failure to offer any proof with respect to the relative values of the stock interests. We cannot and will not assume that Congress indulged in a meaningless gesture when it used the words "in value" after the statement of the requisite percentage. United States v. Parker, 376 F. 2d 402 (C.A. 5, 1967); Trotz v. Commissioner, 361 F. 2d 927 (C.A. 10, 1966), revg. on another point 43 T.C. 127 (1964). In the words of the Fifth Circuit in United States v. Parker, supra at 408, with respect to the language "more than 80 percent in value" in section 1239, We cannot indulge in statutory interpretation by excision. * * * Further, we cannot say that by using "in value" Congress intended us to consider only the factors of voting power or number of shares. * * * "In value" is a broader phrase, and we think that it calls for the familiar, *259 though difficult, process of fair market valuation. See also Trotz v. Commissioner, supra at 930, where the Tenth Circuit concluded that the words "in value" in section 1239 were definitely intended to have a meaning going beyond the mere number of shares, and specifically rejected the contention that the valuation test was supposed to be applied only where there is more than one class of stock outstanding. In United States v. Parker, supra, the outstanding shares of stock in the corporation were held 80 percent in number by one individual, and 20 percent in number by another. However, the court held that for two reasons, the majority shareholder owned over 80 percent in value: (1) There were certain special restrictions on the transferability of the stock owned by the 20-percent shareholder, and (2) the 20-percent shareholder had no effective control over the corporate affairs. The first of these factors does not apply in the present case, but the second certainly does. With respect to the latter point, the Fifth Circuit in Parker noted that the 80-percent shareholder was in sole control of the corporation's affairs; without the consent of the other, *260 he could elect and remove directors and officers, amend the articles, promulgate by-laws, and even dissolve the corporation. With these powers, the majority shareholder "controlled without possibility of challenge the entire operation from the smallest detail to the largest. He exercised so much power that the corporation was his alter ego, or his slave." The Court said that this was the situation at which the statutory language was aimed; it pointed out that any purchaser of the 20-percent stock interest "would not be buying any degree of control over the corporation." It stated that the voting power which technically inhered in the minority stock interest was "in reality worthless," with the majority shareholder having "all of the real voting stock." It concluded that the disability which inhered in the minority stock interest reduced its value per share below that of the majority shareholder's stock "as a matter of law." 376 F. 2d at 409. We think that the observations and conclusions of the Fifth Circuit in Parker are substantially applicable in the case at hand. We are mindful that in Parker, the numerical ownership of the dominant shareholder was exactly 80 percent, *261 so that the most minute increment in the per-share value of his holding would tip the balance under section 1239. Nevertheless, Mr. Hudlow's numerical ownership is a scant 1.04 percentage points away from the tipping point provided by section 178, and in light of the significance that the Parker court attached to the lack of leverage of the minority shareholder, we think that this factor probably does serve to tip the balance in the instant case. Indeed, this Court has previously recognized that a minority stock interest in a closely held corporation is often worth significance less than the proportionate share of assets to which it attaches. Estate of Irene de Guebriant, 14 T.C. 611, 619 (1950), revd. per curiam on another point sub nom. Claflin v. Commissioner, 186 F. 2d 307 (C.A. 2, 1951); Mathildeb. Hooper, Administratrix, 41 B.T.A. 114, 129 (1940). See also other authorities cited in United States v. Parker, supra. We conclude that Southern has utterly failed to prove that Mr. Hudlow does not own 80 percent or more in value of its outstanding stock. For that reason, Mr. 931 Hudlow and Southern will be treated as *262 being "related persons" under section 178, and Southern must amortize the cost of the improvements on the leased property over the useful life of such improvements. The respondent has determined the length of the useful life as 30 years for the main building and 25 years for the addition. The petitioner did not take issue with such determination on brief; but at trial, when Mr. Hudlow was asked to estimate the useful life of the building, he answered, "I'd say about twenty years without any problem." Obviously, such statement does not prove error in the respondent's determination. Issue 18 Findings of Fact Southern purchased a building located on Manufacturers Road (the Manufacturers Road building) in 1961 for $76,000. Two sides of the building are made of concrete block with a brick veneer exterior, and are of very substantial construction. One side is made primarily of corrugated asbestos, and the other side is partly corrugated asbestos and partly glass. There is a steel supporting structure for the roof, and a steel roof deck. The building has an approximate ground area of 4,800 square feet. It was originally built for use as an experimental lab. Its interior includes *263 about 1,200 square feet of air conditioned office space. Because of some unusual features of the building, Southern has experienced some difficulty in leasing it; however, it has leased such building to three different tenants over an 8-year period. One of the tenants used it as a testing lab for a stove company. At the time of trial, the building was leased to a company which deals in golf equipment, for the purpose of storing and shipping golf clubs and bags. On its tax returns for the years 1964, 1965, and 1966, Southern claimed depreciation on the Manufacturers Road building on the basis of a 20-year useful life; but the respondent has determined that the actual useful life of the building for depreciation purposes is 30 years. Opinion The issue for decision is the useful life of the Manufacturers Road building, which will in turn determine the amount of the depreciation deduction to which Southern was entitled with respect thereto in the years in issue. The respondent has determined a useful life of 30 years; such determination is presumptively correct, and the petitioner has the *264 burden of proving it erroneous. M. Pauline Casey, 38 T.C. 357, 381 (1962); Rule 32, Tax Court Rules of Practice.
In addition to the description of the building, the only direct evidence as to its useful life is Mr. Hudlow's testimony, which, in its entirety, was as follows: I would say normally, if this was not a specialized building, if we had not bought the building second hand, and if it didn't have all these special gratings in it and so forth, I don't think I would disagree with a thirty year life on it, but in the condition it's in, we felt like at the time of the acquisition, I believe we set it up on a twenty year life, didn't we? We felt twenty years would be fair depreciation on the thing. Certainly within that period of time we'll have to replace the entire south wall [the asbestos and glass wall] and probably the east wall [the primarily asbestos wall], and will probably have to replace all the grating in the entire interior of the building. We do not believe that such testimony, based as it is on unsupported general assertions, is sufficient to carry the burden of proof. See Coors Porcelain Co., 52 T.C. 682, 695 (1969), affd., *265 429 F. 2d 1 (C.A. 10, 1970). Mr. Hudlow did not indicate upon what information or experience he based his belief that two of the building's walls would have to be replaced within 20 years. Similarly, we have no way of knowing how he reached the conclusion that the interior grating would have to be replaced within such time period, nor do we know what a replacement of the grating would cost. Also, he referred to "the condition it's in," but nothing else in his testimony gave any indication as to what that condition was. We do know that two of the sides of the building are of very substantial construction, but we have no reason to believe that other parts of the building are of a particularly weak or flimsy construction. No evidence was introduced with respect to the lifespan of asbestos construction. We sustain the determination of the respondent. Merchants and Manufacturers Transfer Co; Inc. Docket Nos. 664-69, 6042-69 Issue 19 Findings of Fact On its income tax returns for its taxable years ended March 31 of the following 932 years, M & M claimed deductions for the alleged salaries, bonuses, and commissions as listed: 1964
1965
1966
1967
Salary - J. W. Whitaker
$11,555
$12,100
$14,000
$15,150
Bonus - J. W. Whitaker
2,500
3,000
4,000
Commission - W. C. Hudlow, Jr
7,500
9,000
12,000
7,500
*266 Of the total amounts of the alleged "bonuses" and "commissions" paid in each of the first 3 years in issue, Mr. Hudlow received 75 percent and Mr. Whitaker 25 percent. Such alleged salaries, bonuses, and commissions listed for the taxable years ending March 31, 1966 and 1967, were paid within 2 1/2 months after the close of the taxable years. On March 31, 1964, M & M accrued on its books the $2,500 bonus for Mr. Whitaker and the $7,500 commission for Mr. Hudlow for which such corporation claimed deductions in the taxable year ending on that date. However, Mr. Whitaker's $2,500 was paid on the following dates in 1964: $1,000 on May 5, $700 on June 12, and $800 on August 7. Mr. Hudlow's $7,500 was paid on the following dates in 1964: $3,750 on May 5, $2,500 on June 10, and $1,250 on August 27. On March 31, 1965, M & M accrued on its books the $3,000 bonus to Mr. Whitaker and the $9,000 commission for Mr. Hudlow for which such corporation claimed deductions in the taxable year ending on that date. However, Mr. Whitaker's $3,000 was paid through his accounts receivable account over a period of time as he withdrew money, or as journal entries were made to charge his account. When *267 the credit of $3,000 was made to the account, it had a debit or charge balance of $666.40 already. Further charges were made under the date of March 31, 1965, in the amounts of $119.46 and $1,000.00. Other charges to the account, later in 1963, were: $12.90 on May 31, $500.00 on August 31, $347.15 on October 31, and $436.95 on December 31. Mr. Hudlow's $9,000 was paid in three payments of $3,000 each, on June 29, August 23, and November 18, 1965. M & M is in the local drayage business. It was formed by Mr. Hudlow by taking a part of the business away from Arrow and transferring it to M & M. Mr. Whitaker was an employee of Arrow at the time M & M was formed; he put no money into M & M at the time of its formation. Mr. Whitaker operated M & M on a daily basis during the years in issue, but Mr. Hudlow conferred with him at least weekly regarding business operations. Mr. Hudlow also made some of the business decisions with respect to M & M when such decisions affected Chattanooga or its customers. In addition, he was helpful in obtaining customers for M & M's services. Mr. Hudlow received no "commissions" from M & M during the first few years of its operations, because the corporation *268 lacked the money with which to pay him. During the years when "commissions" were paid to Mr. Hudlow, their amount was determined by agreement between him and Mr. Whitaker at the end of the fiscal year; they split the profits between them. In the words of Mr. Hudlow, "At the end of the fiscal year we'd sit down and say we have made this much money, how much money is available, * * * and the way it wound up, we'd sort of split the kitty." When he was asked whether "the kitty" meant "the profits," he said, "The money, yes, whatever you want to call it, the profits." In docket No. 664-69, the respondent disallowed in full the deductions claimed by M & M as bonuses to Mr. Whitaker and as commissions to Mr. Hudlow during the taxable years ended March 31, 1964 through 1966. [5] The respondent determined that the amounts of Mr. Whitaker's bonus and Mr. Hudlow's commission in each such year were intended as dividend distributions to the two recipients, citing the fact that such amounts were in direct proportion to their ownership of stock. In addition, the respondent determined that $1,250 of Mr. Hudlow's alleged commission for the year ended March 31, 1964, and all of Mr. Hudlow's alleged *269 commission for the year ended March 31, 1965, were not deductible 933 by M & M in any event, because such commissions were not paid within 2 1/2 months after the close of the respective taxable years in which they were accrued. In docket No. 6042-69, the respondent disallowed all of Mr. Hudlow's alleged commission [6] for the taxable year ended March 31, 1967; he determined that it was really a dividend. Opinion We must decide whether M & M has shown error in the respondent's determinations with respect to the alleged compensation paid to Messrs. Hudlow and Whitaker during the years in issue. M & M has conceded on brief that the respondent correctly determined that certain of the alleged commissions accrued for Mr. Hudlow *270 were not paid within 2 1/2 months of the end of the corporation's taxable year for which a deduction was claimed, but the petitioner contends that such amounts should be treated as deductible compensation when paid, and not as dividends. We need not repeat the legal principles and authorities which we set forth in the prior issues dealing with corporate deductions for compensation. With respect to Mr. Hudlow's "commissions" and Mr. Whitaker's "bonuses," M & M must show that (1) the corporation intended to pay such amounts as compensation for services actually performed, rather than as distributions of profits, and (2) the amounts paid did not exceed the reasonable compensation for the services performed. It appears that Mr. Hudlow's "commissions" and Mr. Whitaker's "bonuses" in the years ended March 31, 1964, 1965, and 1966 were determined by the two shareholders getting together at the end of the year, figuring out the amount of the corporate profits that were available for payment, and splitting such profits in direct proportion to their respective stock interests. On the basis of such facts, without more, it is difficult to imagine a more convincing case for the conclusion that *271 all of such payments were dividends. However, with respect to Mr. Hudlow, there is something more. We believe that he was helpful in obtaining customers for the corporation's services; and we recognize that, in light of his experience, his business judgment and advice had value to M & M, when he consulted with Mr. Whitaker and participated in certain of M & M's business decisions. Thus, we do not conclude that M & M intended to pay him nothing for such services, and we do not conclude that such services had a reasonable value of zero. We find that, with respect to each of the taxable years in issue, Mr. Hudlow's services for M & M had a reasonable value of $4,000, and M & M intended to pay him that amount for his services with respect to each such year. We realize that the profit-splitting arrangement was not followed in the last of the taxable years in issue, the one ending March 31, 1967; this fact may have had something to do with the entry upon the scene of the respondent's agent in August 1966. However, our determination of $4,000 compensation applies to this last year as well as the others, because there has been no showing that Mr. Hudlow's services were of greater value *272 in any one year than in the others. Mr. Hudlow testified that he performed very valuable services for M & M in securing a substantial part of its business, but with respect to such testimony, it would be appropriate to repeat what we noted previously with respect to the number of different business interests in which he has been continuously engaged, with the inevitable result that his time and efforts must have been spread relatively thin among some of them. Furthermore, he was neither an officer nor a director of M & M during the years in issue, and he apparently did not have the type of well-defined duties which must be performed with regularity in order for the business to function. The inexactitude of the evidence must be weighed against the party with the burden of proof. Moreover, we feel that the evidence on this issue, particularly with respect to the method by which the "commissions" were determined, could support a total disallowance of deductions for Mr. Hudlow's alleged compensation on the ground that the "commissions" were intended as distributions of profit and should therefore be treated as such, despite the fact that some services were performed. Charles McCandless Tile Service v. United States, 422 F. 2d 1336, 1339 (Ct. Cl. 1970); *273 Northlich, Stolley,inc. v. United States, 368 F. 2d 272, 278 (Ct. Cl. 1966); Irby Construction 934 Company v. United States, 290 F. 2d 824, 826 (Ct. Cl. 1961); Klamath Medical Service Bureau, 29 T.C. 339, 347 (1957), affd. 261 F. 2d 842 (C.A. 9, 1958), cert. denied 359 U.S. 966 (1959). Therefore, even when we take into account that portion of the evidence which tends to be favorable to the petitioner, we do not believe that the allowance of compensation made here is by any means niggardly. Of course, we adopt M & M's concession as to the timing of the payments. See sec. 267(a)(2). As a result of such concession and our conclusion, it follows that M & M is entitled to deductions for compensation to Mr. Hudlow in the amounts of $4,000 for the taxable year ended March 31, 1964; zero for the taxable year ended March 31, 1965; $8,000 (half of which represents compensation paid on account of the previous year) for the taxable year ended March 31, 1966; and $4,000 for the taxable year ended March 31, 1967. With respect to Mr. Whitaker's services, M & M has made no showing whatsoever that such services in any of *274 the years in issue were worth more than the amount of his basic salary, without the bonus. Such lack of evidence, combined with the nature of the profit-splitting arrangement, convinces us that the so-called "bonuses" were in essence, and were intended to be, distributions of the corporate profits. Accordingly, we sustain the respondent's determination disallowing the deductions for such "bonuses." Decisions will be entered under Rule 50 in docket Nos. 660-69, 661-69, 662-69, 664-69, and 6042-69. Decision will be entered for the respondent in docket No. 663-69. Footnotes
1. Cases of the following petitioners are consolidated herewith: Chattanooga Warehouse and Cold Storage Company, Docket No. 661-69; Arrow Transfer and Storage Company, Docket No. 662-69; Southern Land and Development Company, Docket No. 663-69; Merchants and Manufacturers Transfer Co., Docket Nos. 664-69, 6042-69.↩
2. All statutory references are to the Internal Revenue Code of 1954.↩
2a. We do not pass judgment here on whether this amount was a payment of compensation or a dividend; such judgment is made later, in issue 14. However, we wish to note at this juncture that the petitioner and Arrow made no argument to the effect that Arrow's earnings and profits were insufficient for the payment of the dividends that have been alleged in this case.↩
3. There is no explanation of why the amount in dispute with respect to 1964 should be twice the amount of the annual rental fixed by the lease.↩
4. Chattanooga's books show that the liability was to "Carl A. Swafford, C.P.A." rather than to the firm of Swafford & Taylor. However, the testimony of William L. Taylor, Jr., another member of such firm, indicated that the liability was to the firm. For the purpose of this issue, we use "Swafford & Taylor" interchangeably with "Carl A. Swafford, C.P.A."↩
5. At one point in the explanation of adjustments, "1965" is repeated and the year 1966 is not mentioned; but it is clear from the context that the second time "1965" appears, "1966" was intended. ↩
6. It is stipulated that M & M claimed a deduction of $7,500.00 for the commission paid to Mr. Hudlow in that taxable year, yet the respondent disallowed an amount of $7,655.15 as the commission allegedly paid to Mr. Hudlow. This discrepancy is not explained.↩